704 F.2d 1465
 26 Wage & Hour Cas. (BN 152, 97 Lab.Cas. P 34,373
 Eleanor BONNETTE, Faye Pryor, Vickie Young, Joanne R.
Cardone, Wai Jin Wong Fong, Thet Poy Chung,
Elizabeth Tears, Plaintiffs-Appellees,
United States of America,[1] Intervenor,
v.
CALIFORNIA HEALTH AND WELFARE AGENCY and Mario Obledo;
California Department of Health and Beverlee Myers;
California Department of Social Services and Marion Woods;
Solano County Public Welfare Department and Crawford Tucker;
San Francisco County Department of Social Services and
Edwin Sarsfield; Sacramento County Department of Social
Welfare and William Redmond, Defendants-Appellants.
 Nos. 81-4565, 82-4174.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 14, 1982.
Decided May 5, 1983.
As Amended June 22, 1983.
 
 Scott A. Fink, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for plaintiffs-appellees.
 Joseph Woodward, Dept. of Labor, Washington, D.C., for intervenor.
 Winifred Y. Smith, San Francisco, Cal., Thomas H. Gordinier, Fairfield, Cal., Gretchen Nicholson, San Francisco, Cal., for defendants-appellants.
 Appeal from the United States District Court for the Northern District of California.
 Before ANDERSON, HUG, and NORRIS, Circuit Judges.
 HUG, Circuit Judge:
 
 
 1
 This action, alleging violation of the Fair Labor Standards Act's minimum wage provisions, was brought against state and county agencies by individuals who provided in-home care to disabled public assistance recipients. The district court, 525 F.Supp. 128, entered judgment for the plaintiffs-appellees. On appeal, the State and Counties argue that (1) they were not employers of the plaintiffs-appellees within the meaning of the Fair Labor Standards Act, (2) the tenth amendment exempts them from the Fair Labor Standards Act's provisions, and (3) the district court's award of attorneys' fees was an abuse of discretion. We affirm the judgment.
 
 
 2
 * BACKGROUND and FACTS
 
 
 3
 This is an action against welfare agencies of the State of California and three of its counties for back wages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. Secs. 201-219. In 1974, Congress removed from the FLSA the exemption that had previously been afforded to states and their political subdivisions. Thus, under the terms of the FLSA, as amended in 1974, state employees were covered by its provisions.
 
 
 4
 California provides domestic in-home services to the aged, the blind, and the disabled through programs that were initiated by and funded in part by the federal government. Since 1974, these services have been provided under California's In-Home Supportive Services plan. Cal.Welf. & Inst.Code Secs. 12300-12308 (West 1980). These services enable aged, blind, and disabled public assistance recipients to remain in their own homes, thereby benefiting the recipients and reducing the need for costly institutional care.
 
 
 5
 The plaintiffs-appellees ("chore workers") were employed to provide these services to disabled public assistance recipients ("recipients") between May 1974 and October 1976. The chore workers performed a wide variety of domestic tasks for recipients who were unable to perform these tasks themselves. See Cal.Welf. & Inst.Code Sec. 12300 (West Supp.1982).
 
 
 6
 The chore worker program is funded in large part by the federal government pursuant to Title XX of the Social Security Act. During the period at issue, Title XX funds were available for 75% of the program's cost. In order to qualify for the federal funds, the state had to comply with various federal requirements and regulations, and had to submit and receive approval of its plan for in-home services. See 45 C.F.R. Secs. 1395.2-1396.93 (1980).
 
 
 7
 The California Legislature set eligibility standards and methods by which counties could provide in-home care. E.g., Cal.Welf. & Inst.Code Secs. 12302, 12304 (West 1980). The counties were responsible for the day-to-day operation of the programs. The legislature specified three methods by which the counties could deliver chore worker services: the counties could hire chore workers directly, contract with agencies or individuals for such services, or make direct payment to the recipients for the "purchase" of chore worker services. Cal.Welf. & Inst.Code Sec. 12302 (West 1980). All of the counties involved in this action chose the third method of delivery--the recipients "purchased" chore worker services with money provided by the county.
 
 
 8
 Under this method of delivery, a county social worker would determine the recipient's financial eligibility and need for chore worker services. After consultation with the recipient and others, using a standard county form, the social worker would determine the tasks to be performed for the recipient by the chore worker and the hours per week required to perform the tasks.
 
 
 9
 The recipient was responsible for hiring and firing the chore worker. Recipients were encouraged to select relatives or friends as chore workers. If the recipient had no one in mind, the county social worker would provide a list of potential chore workers. In some instances, where the recipient was unable or unwilling to do so, the social worker would hire the chore worker.
 
 
 10
 The recipient was responsible for the day-to-day supervision of the chore worker. The social worker would intervene if a problem arose which the recipient could not handle. Although the recipient was expected to fire the chore worker if it became necessary, in some instances this duty was performed by the social worker.
 
 
 11
 The chore workers were paid by the hour, but with a ceiling based on the recipient's maximum grant. In some cases, the total number of hours approved for the chore worker exceeded the capacity of the grant to pay out at the prevailing wage. Verification of the hours worked was required by the counties before payment was made. The counties would not approve payment for hours worked in excess of those authorized.
 
 
 12
 At different times the counties used various methods of payment, including two-party checks payable to the recipient and chore worker, checks payable directly to the recipient with the understanding that the recipient would pay the chore worker, and checks payable directly to the chore worker.
 
 
 13
 During the period at issue here, May 1974 to October 1976, the hourly rate of pay was established by the county. The recipient was not permitted to pay a higher rate than allowed by the county. The chore workers were sometimes paid at a rate below the federal minimum wage either because the county hourly rate was below the minimum wage or because the grants were not large enough to pay the chore workers the minimum wage for the hours worked.[2]
 
 
 14
 Eight chore workers brought this action alleging that they had been paid less than the federal minimum wage in violation of the FLSA. The State and Counties denied that they employed the chore workers within the meaning of the FLSA, and in the alternative argued that the tenth amendment exempted them from the minimum wage requirements of the FLSA.
 
 
 15
 After a trial, and on the basis of the parties' stipulation of facts, the district court ruled for the chore workers and awarded $18,455 in damages and $100,000 for attorneys' fees. The State and Counties appeal.
 
 II
 
 16
 "EMPLOYER" UNDER FLSA
 
 
 17
 In order for the minimum wage provisions of the FLSA to apply, the appellants must be "employers" of the chore workers within the meaning of the FLSA. The district court found that the appellants were the chore workers' employers. The appellants argue that this was error.
 
 A. Standard of Review
 
 18
 Citing Real v. Driscoll Strawberry Assocs., Inc., 603 F.2d 748 (9th Cir.1979), the chore workers argue that the district court's determination that the appellants are "employers" under the FLSA should be reviewed as a question of fact. In Real, we reversed the summary judgment because the record demonstrated "the existence of genuine factual issues concerning whether [defendant was] an 'employer' of the appellants, within the meaning of the FLSA." Id. at 755. The chore workers apparently interpret this as holding that the "employer" determination is a finding of fact. Read in context, however, it is clear that the "genuine factual issues" were subsidiary factual questions and not the ultimate question of whether the defendant was an "employer." See Id.
 
 
 19
 The Supreme Court has referred to a similar question under the NLRA as "essentially a factual issue," but that was in the context of deferring to a determination by the NLRB, an administrative agency with a particular expertise, unlike the district courts. Boire v. Greyhound Corp., 376 U.S. 473, 481, 84 S.Ct. 894, 898, 11 L.Ed.2d 849 (1964); see also NLRB v. Hearst Publications, Inc., 322 U.S. 111, 130-31, 64 S.Ct. 851, 860-861, 88 L.Ed. 1170 (1944). In FLSA cases, although it has not explicitly discussed the standard of review, the Supreme Court appears to treat the ultimate question of whether a party is an "employer" as a legal issue. See Goldberg v. Whitaker House Cooperative, Inc., 366 U.S. 28, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961); Rutherford Food Corp. v. McComb, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947); see also Shultz v. Hinojosa, 432 F.2d 259, 264 (5th Cir.1970).
 
 
 20
 The Eighth Circuit treats this determination as a legal one. Wirtz v. Barnes Grocer Co., 398 F.2d 718, 722 (8th Cir.1968). The Fifth Circuit also treats this as a legal question, although some earlier cases from that circuit considered it as a factual question. Compare Donovan v. Tehco, Inc., 642 F.2d 141, 143 n. 4 (5th Cir.1981); and Shultz v. Hinojosa, 432 F.2d at 264; with Hodgson v. Griffin and Brand of McAllen, Inc., 471 F.2d 235, 238 (5th Cir.), cert. denied, 414 U.S. 819, 94 S.Ct. 43, 38 L.Ed.2d 51 (1973); and Wirtz v. Lone Star Steel Co., 405 F.2d 668, 669 (5th Cir.1968).
 
 
 21
 We agree with the Eighth Circuit and the most recent Fifth Circuit precedent. Although the underlying facts are reviewed under the clearly erroneous standard, the legal effect of those facts--whether appellants are employers within the meaning of the FLSA--is a question of law. See generally Jaffe, Judicial Review: Question of Law, 69 Harv.L.Rev. 239, 241 (1955). The reasons for deferring to the district court's determinations of fact do not apply in this case to the legal conclusion the court draws from those facts.
 
 B. Appellants as "Employers" Under FLSA
 
 22
 Under the FLSA, "employer" is defined as follows:
 
 
 23
 "Employer" includes any person acting directly or indirectly in the interest of an employer in relation to an employee ....
 
 
 24
 29 U.S.C. Sec. 203(d). The definition of "employer" under the FLSA is not limited by the common law concept of "employer," and is to be given an expansive interpretation in order to effectuate the FLSA's broad remedial purposes. Real v. Driscoll Strawberry Assocs., 603 F.2d 748, 754 (9th Cir.1979). The determination of whether an employer-employee relationship exists does not depend on "isolated factors but rather upon the circumstances of the whole activity." Rutherford Food Corp. v. McComb, 331 U.S. 722, 730, 67 S.Ct. 1473, 1477, 91 L.Ed. 1772 (1947). The touchstone is "economic reality." Goldberg v. Whitaker House Cooperative, Inc., 366 U.S. 28, 33, 81 S.Ct. 933, 936, 6 L.Ed.2d 100 (1961).
 
 
 25
 Two or more employers may jointly employ someone for purposes of the FLSA. Falk v. Brennan, 414 U.S. 190, 195, 94 S.Ct. 427, 431, 38 L.Ed.2d 406 (1973). All joint employers are individually responsible for compliance with the FLSA. 29 C.F.R. Sec. 791.2(a) (1981). Regulations issued by the Department of Labor give the following examples of joint employment situations:
 
 
 26
 (2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or
 
 
 27
 (3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.
 
 
 28
 29 C.F.R. Sec. 791.2(b) (footnotes omitted). The district court used a joint employment theory to find that the appellants were employers of the chore workers.
 
 
 29
 The district court, while acknowledging that its determination must be based on "a consideration of the total employment situation and the economic realities of the work relationship," looked in particular to four factors: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." In varying combinations, these factors have been considered by other courts for the same purpose. See, e.g., Real, 603 F.2d at 756; Hodgson v. Griffin and Brand of McAllen, Inc., 471 F.2d at 237-38. More important, these four factors are relevant to this particular situation.
 
 
 30
 Appellants argue that these factors were developed in cases involving profit-seeking employers and should not be blindly applied here, where the alleged employers are public social service agencies. We agree that this is not a mechanical determination. The four factors considered by the district court provide a useful framework for analysis in this case, but they are not etched in stone and will not be blindly applied. The ultimate determination must be based "upon the circumstances of the whole activity." Rutherford, 331 U.S. at 730, 67 S.Ct. at 1477.
 
 
 31
 It is undisputed that the chore workers' wages were paid by appellants. In some cases the wages were paid directly to the chore worker, in other cases jointly to the chore worker and the recipient, and in still other cases to the recipient with the understanding that the wages would be paid over to the chore worker. Regardless of the method of payment, the chore workers were paid by the appellants. It is also undisputed that the appellants controlled the rate and method of payment, and that they maintained employment records.
 
 
 32
 Appellants also exercised considerable control over the structure and conditions of employment by making the final determination, after consultation with the recipient, of the number of hours each chore worker would work and exactly what tasks would be performed. The recipients were responsible for the day-to-day supervision of the chore workers, but appellants intervened when problems arose which the recipient and the chore worker could not resolve. The district court found that the appellants "had periodic and significant involvement in supervising the chore worker's job performance."
 
 
 33
 The parties disagree about whether appellants had the power to hire and fire the chore workers. The facts are not disputed; it is their characterization that the parties dispute. Appellants argue that it was the recipients who had the power to hire and fire, and the appellants only undertook these responsibilities when, for some reason, the recipient was incapable of carrying them out. The chore workers argue that the appellants' power to confer the grants on the recipients was in effect equivalent to the power to hire, and the power to terminate the grants amounted to the power to terminate the chore workers' employment. Regardless of whether the appellants are viewed as having had the power to hire and fire, their power over the employment relationship by virtue of their control over the purse strings was substantial.
 
 
 34
 We conclude that, under the FLSA's liberal definition of "employer," the appellants were employers of the chore workers. The appellants exercised considerable control over the nature and structure of the employment relationship. They also had complete economic control over the relationship. The "economic reality" was that the appellants employed the chore workers to perform social services for the benefit of the recipients. The fact that the appellants delegated to the recipients various responsibilities does not alter this; it merely makes them joint employers.
 
 III
 TENTH AMENDMENT
 
 35
 The appellants argue that, under the reasoning of National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), the tenth amendment prohibits enforcement of the FLSA's minimum wage provisions in this context. The district court held that the tenth amendment did not apply here.
 
 
 36
 In National League, the Supreme Court held that the minimum wage and overtime provisions of the FLSA could not constitutionally be applied to state and local governments where they would "directly displace the States' freedom to structure integral operations in areas of traditional governmental functions." Id. at 852, 96 S.Ct. at 2474. The Court reasoned that the authority of Congress to legislate under the Commerce Clause is limited by the tenth amendment, which protects the states' authority to make determinations regarding "functions essential to separate and independent existence." Id. at 845, 96 S.Ct. at 2471.
 
 
 37
 The Supreme Court has issued three opinions since National League that further clarify its holding. In Hodel v. Virginia Surface Mining and Reclamation Assoc., 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), which upheld the Surface Mining Control and Reclamation Act of 1977, the Court specified three requirements that must be satisfied before legislation will be invalidated under National League: (1) the challenged statute must regulate "States as States," (2) it must address matters that are "indisputably attributes of state sovereignty," and (3) "it must be apparent that the States' compliance with the federal law would directly impair their ability to structure integral operations in areas of traditional governmental functions." 452 U.S. at 287-88, 101 S.Ct. at 2366. Even where these three requirements are met, a tenth amendment challenge may not succeed if the nature of the federal interest is "such that it justifies state submission." Id. at 288 n. 29, 101 S.Ct. at 2366.
 
 
 38
 In United States Transportation Union v. Long Island Rail Road Co., 455 U.S. 678, 102 S.Ct. 1349, 71 L.Ed.2d 547 (1982), the Court held that the tenth amendment did not prohibit application of the Railway Labor Act to a state-owned railroad, even though the employees involved in the labor dispute were state employees. The Court reiterated the three-prong test announced in Hodel. 455 U.S. at 684, 192 S.Ct. at 1353, 71 L.Ed.2d at 553. It also explained that the holding of National League was that "under most circumstances federal power to regulate commerce could not be exercised in such a manner as to undermine the role of States in our federal system," and that the inquiry should be "whether the federal regulation affects basic State prerogatives in such a way as would be likely to hamper the state government's ability to fulfill its role in the Union and endanger its separate and independent existence." Id., 455 U.S. at 686-687, 102 S.Ct. at 1355, 71 L.Ed.2d at 554.
 
 
 39
 In EEOC v. Wyoming, --- U.S. ----, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983), the Court held that the extension to state and local governments of a federal law prohibiting age discrimination in employment was neither unconstitutional on its face nor unconstitutional as applied to state game wardens. The Court concluded that the degree of federal intrusion arising from the age discrimination law was not significant enough to run afoul of the tenth amendment. Id. at ----, 103 S.Ct. at 1060-1062. The exemption articulated in National League, the Court explained, "is a functional doctrine ... whose ultimate purpose is not to create a sacred province of state autonomy, but to ensure that the unique benefits of a federal system in which the States enjoy a 'separate and independent existence' [citations omitted] not be lost through undue federal interference in certain core state functions." Id. at ----, 103 S.Ct. at 1060.
 
 
 40
 Hodel, Long Island Rail Road, and EEOC make clear that the exemption afforded by the tenth amendment is a narrow one. It shields states only from direct interference with their sovereignty. Federal legislation does not violate the tenth amendment unless it endangers the states' "separate and independent existence." Long Island Rail Road, 455 U.S. at 690, 102 S.Ct. at 1356, 71 L.Ed.2d at 554, 557; National League, 426 U.S. at 851, 96 S.Ct. at 2474.
 
 
 41
 This case turns on the third prong of the Hodel test. The question is whether it is "apparent that the [appellants'] compliance with the federal law would directly impair their ability to structure integral operations in areas of traditional governmental functions." Hodel, 452 U.S. at 288, 101 S.Ct. at 2366.
 
 
 42
 The determination of what is a "traditional [state] governmental function" involves more than an historical analysis. The Supreme Court did not mean "to impose a static historical view of state functions generally immune from federal regulation." Long Island Rail Road, 455 U.S. at 686, 102 S.Ct. at 1354, 71 L.Ed.2d at 554. The crux of the inquiry is whether the particular function is integral to state sovereignty. Id. National League and its progeny are concerned with threats to the states' "separate and independent existence," and it is with this in mind that we consider whether the chore worker program is a "traditional governmental function."
 
 
 43
 The type of work being performed by the state employees in the homes of the recipients under the chore worker program was not the type traditionally performed by states in the exercise of their sovereign responsibilities. Rather, these services have been traditionally performed by domestic employees in the private sector. Furthermore, the chore worker program owes its existence, at least in part, to the federal government. As much as three-quarters of the funding for the chore worker program comes from the federal government under a program in which California elected to participate. Although the program is administered by the state, it is structured in part according to federal regulation, and the federal funding is contingent upon federal approval of the program.
 
 
 44
 If "traditional governmental function" is to be defined in the context of state sovereignty, then such federal involvement is relevant to the inquiry.[3] A program that is set up at the behest of the federal government, and that continues to be regulated and funded in large part by the federal government, is unlikely to be a function integral to the state's "separate and independent existence." Such a program is, in fact, a joint federal and state undertaking. It is unlike such functions as police protection, control over which is essential to a state's status as an independent governmental unit. Federal regulation of the chore worker program through the Commerce Clause poses no significant threat to state sovereignty.
 
 
 45
 We conclude that the chore worker program is not a "traditional [state] governmental function." Accordingly, the tenth amendment is not a bar to the application of the FLSA's minimum wage provisions.[4]IV
 
 ATTORNEYS' FEES
 
 46
 The district court awarded attorneys' fees in the amount of $100,000 under 29 U.S.C. Sec. 216(b). Appellants contend that the amount of this award was an abuse of discretion.
 
 
 47
 The trial court's determination of a reasonable attorney's fee will not be disturbed absent a clear abuse of discretion. Hensley v. Eckerhart, --- U.S. ---, 103 S.Ct. 1933, 1941, 75 L.Ed.2d --- (1983).
 
 
 48
 The district court properly considered the twelve factors established in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir.1974), and adopted by this court in Kerr v. Screen Extras Guild, Inc., 526 F.2d 67, 70 (9th Cir.1975), cert. denied, sub nom. Perkins v. Screen Extras Guild, Inc., 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976).
 
 
 49
 Appellants argue that the fee award should be reduced because appellees did not prevail on their original complaint, the award was disproportionate to the $20,000 recovery, several of the attorneys did not keep adequate time records, and some of the work was duplicative. Although appellees did not prevail on their original complaint, they are entitled to attorneys' fees for time spent on it because the amended complaint on which they did prevail was closely related to the original complaint and resulted in complete relief. Hensley, --- U.S. ---, 103 S.Ct. at 1940. See Rivera, 679 F.2d at 797. The fact that the attorneys' fee award was substantially in excess of the recovery does not necessarily indicate an abuse of discretion. This was considered by the district court, which found the award reasonable "considering the substantive result obtained as well as the monetary recovery." Basing the attorneys' fee award in part on reconstructed records developed by reference to litigation files and other records is not an abuse of discretion. See City of Detroit v. Grinnell Corp., 560 F.2d 1093, 1103 (2d Cir.1977). The district court found that the hours expended were "reasonable for the result achieved," and that any duplication of time was not excessive and "adequately taken care of by the reduced fee."
 
 
 50
 We conclude that the attorneys' fee award was not an abuse of discretion.
 
 
 51
 The judgment is AFFIRMED.
 
 
 
 [1]
 The United States has been permitted by this court to intervene pursuant to 28 U.S.C. Sec. 2403(a)
 
 
 [2]
 Since October 1976, California has required that the chore workers be paid a minimum wage at least equal to the minimum wage set by the FLSA
 
 
 [3]
 The Third Circuit has also found federal involvement relevant to the "traditional governmental function" question. In Kramer v. New Castle Area Transit Authority, 677 F.2d 308 (3d Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 786, 74 L.Ed.2d 993 (1983), that court upheld the application of the FLSA's overtime provisions to a municipally operated mass transit system. An important factor in the determination that the system was not an immune state function was the federal government's involvement through funding programs. Id. at 310. Accord Alewine v. City Council of Augusta, 699 F.2d 1060 (11th Cir.1983); Dove v. Chattanooga Area Regional Transportation Authority, 701 F.2d 50 (6th Cir.1983)
 
 
 [4]
 The district court held that even if the chore worker program was an immune state function, application of the FLSA's minimum wage provisions would not impermissibly impair appellants' ability to structure the program. In 1976, California decided to apply its own minimum wage law, which sets a higher minimum than federal law, to chore workers, and the program was not curtailed. Therefore, the district court reasoned, application of the federal minimum wage law to the chore worker program would not impermissibly compromise state sovereignty
 National League holds that it is not necessary to show that the federal legislation will have a significant impact on the state function, only that it will significantly alter or displace the state's ability to structure the operation of the function. 426 U.S. at 851, 96 S.Ct. at 2474. In other words, it is enough if the federal government has withdrawn from the state the authority to make certain fundamental decisions. Id. National League holds that applying the FLSA's minimum wage provisions does significantly alter or displace a state's ability to structure its operations. Id. Accordingly, if the chore worker program were a "traditional governmental function," the fact that California could pay the federal minimum wage without curtailing the program would not cause it to lose its tenth amendment protection.
 Another basis for the district court's decision was that the federal interest in applying the FLSA provisions outweighs the state's interest in avoiding its application. This balancing approach is based on Justice Blackmun's concurrence in National League, 426 U.S. at 856, 96 S.Ct. at 2476, and a footnote in Hodel which states that even when all three prongs of the Hodel test are met there may be situations where "the nature of the federal interest advanced ... justifies state submission." 452 U.S. at 288 n. 29, 101 S.Ct. at 2366 n. 29. The Supreme Court has not yet indicated what circumstances might justify state submission to the federal interest and, in view of our conclusion that the chore worker program is not a traditional state governmental function, we need not address this issue.