BAYSTATE ALTERNATIVE STAFFING, INC., Able Temps Referrals, Inc., Harold Woods, William W. Woods, and Marlene Woods, Plaintiff–Appellants,

v.

Alexis M. HERMAN, Secretary of Labor, United States Department of Labor, Defendant–Appellee.

No. 98–1084.

United States Court of Appeals, First Circuit.

Heard July 30, 1998.

Decided Dec. 30, 1998.

---

**670**

Edward DeFranceschi, for appellant.

Ellen R. Edmond, with whom Marvin Krislov, Deputy Solicitor for National Operations, Steven J. Mandel, Associate Solicitor, Paul L. Frieden, Counsel for Appellate Litigation, were on brief for appellee Secretary of Labor.

Before SELYA, BOUDIN, and LIPEZ, Circuit Judges.

LIPEZ, Circuit Judge.

This appeal involves an action brought in the district court under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, seeking review of a final administrative determination by the Department of Labor's Administrative Review Board (the Board) that Baystate Alternative Staffing, Inc., Able Temps Referrals, Inc., William Woods, Harold Woods, and Marlene Woods willfully violated the overtime compensation provisions of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*, and therefore were subject to civil monetary penalties pursuant to 29 U.S.C. § 216(e).[1] Plaintiff-appellants, who were engaged in the business of providing unskilled workers to factories, cleaning companies, and similar entities in need of temporary labor, maintain that the district court erred by affirming the ruling of the Board that the corporate appellants, Harold Woods, and Marlene Woods were the temporary workers' "employers," within the meaning of the FLSA. Alternatively, plaintiff-appellants argue that the court erred by affirming the Board's conclusion that their alleged violations were "willful," within the meaning of § 16(e) of the Act.

We find no error in the court's affirmance of the Board's ruling that the corporate appellants were "employers" of the temporary workers. We conclude, however, that the Board misperceived the legal standards to be applied to the issues of whether Harold Woods and Marlene Woods were personally liable for civil penalties as "employers" of the temporary workers and whether the conduct of the plaintiff-appellants was "willful," within the meaning of § 16(e). We therefore vacate those portions of the court's judgment resolving those issues and order a remand of this case to the Board for reconsideration of the personal liability and willfulness issues under the correct legal standards.

## I. BACKGROUND

### A. *The Employment Agencies*

Beginning in the early 1980s William Woods formed and operated approximately

---

**1.** After this action was commenced, Secretary Robert B. Reich, who was named as defendant in plaintiff-appellants' complaint, was succeeded by Alexis M. Herman. Pursuant to F.R.A.P. 43(c)(1), Secretary Herman is substituted as defendant-appellee.

ten temporary employment agencies, including plaintiff-appellants Baystate Alternative Staffing, Inc.[2] and Able Temps Referral, Inc. (referred to collectively herein as "Baystate"), in Massachusetts and New Hampshire.[3] After founding the agencies, William was assisted in their operation by his son, Harold Woods, his sister, Ann Woods, and his wife, Marlene Woods, who served the agencies in various capacities as corporate officers and/or managers.

Each of the Baystate agencies was managed in a similar fashion. Baystate advertised its services to companies in need of temporary workers to perform unskilled labor, including industrial and factory work, heavy labor, and assembly and packing. Baystate generally charged its client companies between $6.00 and $7.50 per hour for the services of the workers; from this amount, Baystate usually paid the workers the minimum wage, keeping the premium for itself. Baystate's advertisements represented that it would "handle all the burdensome paperwork, bookkeeping, record keeping, payroll costs, and government reporting." Baystate also informed potential customers that it would provide workers' compensation coverage for the workers, and that it would transport the workers to and from the work site. To obtain temporary workers, client companies called one of Baystate's offices with a job order requesting a specified number of workers.

Baystate required all job applicants seeking temporary work to sign a "Contractor Agreement," which stated that the worker was an independent contractor and not an employee of Baystate. A memorandum attached to the agreement set forth the rules and regulations all workers were required to follow. The memorandum warned that if a worker contacted a client company on his or her own initiative about potential job opportunities, without the involvement of Baystate, the worker would not be placed with a client company in the future. It also prescribed rules on completing and submitting time cards to Baystate, informed workers when they were to present themselves at Baystate's offices for work assignments and how they would be transported to and from job sites, and instructed workers about appropriate clothing and behavior at job sites.

Although Baystate issued the workers' paychecks and apparently provided some type of workers' compensation insurance for the workers, it concedes that it did not pay the workers time-and-one-half their regular rates for hours they worked in excess of forty per week.[4] It also did not deduct federal or state income taxes from the workers' paychecks, contribute to the workers' social security accounts, or pay any state unemployment insurance on the workers' behalf.

## B. The DOL Investigations
### 1. The 1989 Investigation

In 1989 William Pickett, Jr., an investigator from the Wage and Hour Division of the Department of Labor, initiated an investigation of Able Temps. Pickett first met with James Walsh, Able Temps' attorney, at Walsh's office on December 5, 1989. At this meeting, Walsh provided Pickett with the payroll records for Able Temps' "in-house employees"—that is, individuals who were employed by Able Temps as clerks, telemarketers, or in other in-house capacities. Able Temps acknowledged these in-house employees were its "employees," within the meaning of the FLSA. Pickett examined the in-house employees' payroll records and determined that they were being paid in compliance with the FLSA.

Pickett informed Walsh that he also needed the payroll records of the temporary workers. Walsh stated that he had been unaware that Pickett would need the temporary workers' records, and that he did not have the information available at that time.

---

**2.** Baystate Alternative Staffing, Inc. apparently was a shell corporation that never conducted any business.

**3.** Although William founded all of the temporary employment agencies, he chose not to be an officer of any of the corporations for reasons unrelated to this litigation.

**4.** Pursuant to the Act, no "employer" may employ any covered worker for a workweek longer than forty hours unless (subject to certain exceptions not implicated here) such employee receives overtime compensation at a rate of one-and-a-half times his or her regular rate. *See* 29 U.S.C. § 207(a).

In the absence of the temporary workers' payroll records, Pickett and Walsh proceeded to discuss in general terms whether the temporary workers were Able Temps' "employees," within the meaning of the FLSA. Pickett gave Walsh a copy of the Wage and Hour Division's publication entitled "Employment Relationship Under the Fair Labor Standards Act," which set forth a six-factor test used to distinguish between independent contractors and employees.[5]

After discussing the general criteria used by the Wage and Hour Division to determine whether an employment relationship exists between a worker and an alleged employer, Pickett told Walsh that he suspected that Able Temps' temporary workers were its "employees," within the meaning of the FLSA. Walsh disagreed with Pickett's position, and stated his belief that the temporary workers were not Able Temps' employees. As the meeting concluded, Walsh stated that he would contact Able Temps to try to obtain the temporary workers' payroll records.

After calling Walsh's office several times to inquire about the temporary workers' payroll records, Pickett received in early February 1990 a list of names and addresses for 109 temporary workers and a computer disk containing some of the requested payroll information.[6] Because the payroll records were incomplete, Pickett determined that Able Temps' record keeping practices were not in compliance with the FLSA. In April 1990, Pickett informed Walsh that although Pickett suspected that Able Temps had violated the FLSA's overtime provisions, the incomplete state of the payroll records did not allow him

to confirm his suspicions. Pickett told Walsh that the Wage and Hour Division "would like [Able Temps] to enter into a stipulation so that we cannot have this problem in the future."

On April 30, 1990, Able Temps and the DOL executed a stipulation which stated, inter alia, that Able Temps would "maintain an accurate record of daily and weekly hours worked for all employees," and that it would "henceforth comply with the Recordkeeping provisions of Section 11(c), the minimum wage provisions of Section 6, and the overtime provisions of Section 7 of the [FLSA]." The stipulation also stated that "[n]either the execution of this Stipulation nor the performance by the Company of any of its obligations above shall constitute or be construed as an admission by the Company that it has violated any provisions of the Act and such execution and performance shall be without prejudice to the Company's position in this respect." Walsh testified that he believed the stipulation did not prejudice the position of Able Temps that the temporary workers were independent contractors, and that he communicated this opinion to his client.

### 2. The 1992 Investigation

In 1992 Pickett initiated a second investigation of the Woodses' temporary employment business, whose activities were now being conducted through an entity called Alternative Staffing, Inc. Pickett met on several occasions with John Bresnahan, Alternative Staffing's accountant. Pickett gave

---

**5.** The factors were similar to those commonly used by courts examining the independent contractor/employee question: the extent to which the services in question are an integral part of the employer's business; the permanency of the relationship; the amount of the alleged contractor's investment in the facilities and equipment; the nature and degree of control by the principal; the alleged contractor's opportunities for profit and loss; and the amount of initiative, judgment, or foresight in open market competition with others required for the success of the claimed independent enterprise.

The pamphlet also discussed the concept of "joint employment," and set forth the DOL's position that

[w]here the employee performs work which simultaneously benefits two or more employ-

ers, or works for two or more employers during the workweek, a joint employment relationship generally will be considered to exist in situations such as:

. . .

Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee. For example, employees of a temporary help company working on assignments in various establishments are considered jointly employed by the temporary help company and the establishment in which they are employed.

**6.** Pickett mailed questionnaires to the 109 temporary workers, but many of the mailings were returned as "undeliverable" due to inaccurate addresses.

Bresnahan a copy of the DOL's pamphlet "Employment Relationship Under the Fair Labor Standards Act," the same pamphlet he had given to Walsh in 1989, and informed Bresnahan that his "determination had been and would probably be this time that [the temporary workers] were still employees of [Alternative Staffing]." Bresnahan disagreed with Pickett, asserting that Alternative Staffing did not exercise sufficient control over the temporary workers to be their employer. Bresnahan informed William Woods and James Walsh of Pickett's position, and of his (Bresnahan's) opinion that the temporary workers were not Alternative Staffing's employees.

In December 1992, Pickett began a protracted effort to obtain the payroll records of the temporary workers from Alternative Staffing. After having little success in obtaining the records, Pickett served Harold Woods with a subpoena duces tecum in March 1993. Woods failed to comply with the subpoena, and Pickett obtained an order from the district court in July 1993 mandating compliance. In September 1993, Pickett was promoted and Patricia Colarossi was assigned to continue the Alternative Staffing investigation. Colarossi continued to experience difficulty obtaining all the records requested in the subpoena. Based on the information that had been provided to her, however, Colarossi determined that Alternative Staffing had failed to pay 619 temporary workers overtime compensation during the period from September 1991 to July 1994. Colarossi also recommended, with her supervisor's concurrence, that Baystate and four members of the Woods family—William, Harold, Marlene, and Ann—be assessed civil monetary penalties for "willful violations," pursuant to § 16(e) of the FLSA.

### C. *Procedural History*

Following the Wage and Hour Administrator's assessment of a $150,000 civil monetary penalty against Baystate and the Woodses for willful violations of the FLSA's overtime

provisions, plaintiffs filed a timely exception.[7] Pursuant to 29 C.F.R. § 580.10, the matter was referred for a hearing before an administrative law judge ("ALJ"). In June 1996 the ALJ issued a Decision and Order affirming the Administrator's assessment. In the decision, the ALJ held that the temporary workers were the employees of Baystate and were not independent contractors; that William, Harold, Marlene, and Ann Woods were employers in their individual capacities of the temporary workers, and were thus personally liable for the assessment; and that the FLSA violations were willful, within the meaning of 29 U.S.C. § 216(e).

Baystate, William Woods, Harold Woods, Marlene Woods, and Ann Woods thereafter appealed the ALJ's decision to the Board, which the Secretary has designated to issue final agency decisions under § 16(e) of the FLSA. See 29 C.F.R. §§ 2.6, 580.13. The Board affirmed the ALJ's determination that the temporary workers were Baystate's employees, not independent contractors. The Board also affirmed the ALJ's determination that Harold and Marlene Woods were individually liable for the assessment as employers of the temporary workers. The Board reversed, however, the ALJ's conclusion that Ann Woods was an employer of the temporary workers.[8] Finally, the Board affirmed the ALJ's conclusion that the FLSA violations were willful, within the meaning of § 16(e).

Baystate, William Woods, Harold Woods, and Marlene Woods thereafter brought an action in the district court seeking review of the Board's decision pursuant to the APA, 5 U.S.C. § 701 *et seq.* In their complaint, plaintiffs asserted that the Board's conclusions that (1) their alleged violations were "willful" and that (2) Baystate, Harold, and Marlene were the temporary workers' "employers," within the meaning of the FLSA, were not in accordance with applicable law. After the parties filed cross-motions for a

7. Concurrent with the civil monetary penalty assessment, the Secretary brought an action in the United States District Court seeking to recover the back wages due the temporary workers as a result of the alleged overtime compensation violations. That action is now pending before the district court.

8. According to the Board's decision, plaintiffs "apparently concede[d]" that William Woods was an employer of the workers and did not challenge the ALJ's determination on that issue.

summary judgment, the district court rejected plaintiffs' contentions and granted a summary judgment in favor of the Secretary. This appeal followed.

## II. DISCUSSION

Pursuant to § 16(b) of the FLSA, any employer who violates the overtime compensation or minimum wage provisions of sections 6 or 7 is liable to the employee or employees affected in the amount of their unpaid minimum wages or overtime compensation, plus an additional equal amount as liquidated damages. *See* 29 U.S.C. § 216(b). In 1989, Congress amended the Act to authorize the imposition of a civil penalty on "any person who repeatedly or willfully violates" the overtime compensation and minimum wage provisions of sections 6 and 7. *See* 29 U.S.C. § 216(e).

Plaintiffs challenge the imposition of civil penalties on two independently sufficient grounds. First, they contend that the district court erred by affirming the Board's ruling that the temporary workers were Baystate's, Harold Woods', and Marlene Woods' "employees," within the meaning of the Act, and that the temporary workers thus fell within the scope of the FLSA's provisions. Alternatively, plaintiffs argue that even if the temporary workers were their employees, the district court erred by affirming the Board's finding that Baystate, Harold Woods, Marlene Woods, and William Woods "willfully" violated the FLSA's overtime compensation provisions, within the meaning of § 16(e) of the Act. As set forth below, we agree in part.

### A. *Corporate Plaintiffs' Status as "Employers"*

#### 1. Standard of Review

■ In the administrative law context, where we review directly the decision of the agency, the APA can serve as an overlay to the familiar de novo standard applicable to appeals from a district court's grant of a summary judgment. *See Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir.1997). Where the APA obtains, as here, a court may set aside an administrative action only if that action is arbitrary, capricious, or otherwise contrary to law. *See* 5 U.S.C. § 706(2)(A)-(D); *Associated Fisher-*

*ies*, 127 F.3d at 109; *see also Commonwealth of Mass. Dep't of Pub. Welfare v. Secretary of Agric.*, 984 F.2d 514, 525 (1st Cir.1993). Thus, in our direct review of the agency's decision, we employ the same standard of review that was applicable before the district court.

In this case, plaintiffs apparently do not challenge the Board's factual findings, but rather argue that those facts do not support the Board's conclusion that Baystate was an "employer" of the temporary workers. In so arguing, plaintiffs challenge the Board's application of the law to established facts. We have previously noted that some question exists about the proper level of deference to accord agency decisions of this sort. *See Carr Investments, Inc. v. Commodity Futures Trading Comm'n*, 87 F.3d 9, 12–13 (1st Cir.1996); *see also Maloley v. R.J. O'Brien & Assocs., Inc.*, 819 F.2d 1435, 1440 (8th Cir. 1987) (observing that "[a]s to the proper standard of review of an agency's application of law to undisputed or established facts, it has been noted that the Supreme Court has developed two opposing lines of authority"); *see generally* 5 K. Davis, Administrative Law Treatise, §§ 29.9–.10, at 365–81 (2d ed.1984) (discussing scope of review problems that arise when law is applied to undisputed or established facts). While we are aware that such uncertainties exist concerning the proper standard to be applied to an agency's application of law to established facts, we need not resolve the matter here. Rather, because we find that the Board's decision with respect to the corporate plaintiffs survives even a more probing de novo standard of review, we have no occasion to traverse this difficult terrain. *Cf., e.g., Carr Investments*, 87 F.3d at 12–13 (refraining from deciding what level of deference should be applied to agency's application of law to facts, where agency's decision could not survive even under the more deferential standard).

#### 2. Corporate Plaintiffs' Employer Status

■ Throughout the course of this litigation, plaintiffs maintained that the temporary workers were in fact "independent contractors," not employees, and that the FLSA's overtime compensation provisions therefore are inapplicable. Using a six-factor test

commonly used to distinguish between independent contractors and employees in the context of the FLSA, *see, e.g., Martin v. Selker Bros., Inc.,* 949 F.2d 1286, 1293 (3d Cir.1991), the Board rejected plaintiffs' contention and concluded that the workers were "employees" within the meaning of the Act. At oral argument, plaintiffs finally conceded this point, but continued to insist that the workers were the employees only of the client companies for whom they performed labor, rather than the employees of plaintiffs. The Board had also rejected this contention. We affirm the Board's conclusion that the corporate plaintiffs were employers of the temporary workers, notwithstanding the alleged simultaneous employer status of the client companies.

■■■ The Act defines an "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). An "employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee...." *Id.* § 203(d). The Act further states that the term "employ" includes "to suffer or permit to work." *Id.* § 203(g). In determining the scope of the Act, courts have consistently recognized that "a broader or more comprehensive coverage of employees within the stated categories would be difficult to frame." *United States v. Rosenwasser,* 323 U.S. 360, 362, 65 S.Ct. 295, 89 L.Ed. 301 (1945). These definitions "... [are] comprehensive enough to require [their] application to many persons and working relationships, which prior to this Act, were not deemed to fall within an employer-employee category." *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 729, 67 S.Ct. 1473 (1947) (quoting *Walling v. Portland Terminal Co.,* 330 U.S. 148, 150, 67 S.Ct. 639, 91 L.Ed. 809). Moreover, the remedial purposes of the FLSA require courts to define " 'employer' more broadly

than the term would be interpreted in traditional common law applications." *Dole v. Elliott Travel & Tours, Inc.,* 942 F.2d 962, 965 (6th Cir.1991). The FLSA contemplates several simultaneous employers, each responsible for compliance with the Act. *See Falk v. Brennan,* 414 U.S. 190, 195, 94 S.Ct. 427, 38 L.Ed.2d 406 (1973); *Bonnette v. California Health & Welfare Agency,* 704 F.2d 1465, 1469–70 (9th Cir.1983); *see also* 29 C.F.R. § 791.2(a).

■ Accordingly, to determine whether an employment relationship exists for the purposes of federal welfare legislation, courts look not to the common law conceptions of that relationship, but rather to the "economic reality" of the totality of the circumstances bearing on whether the putative employee is economically dependent on the alleged employer. *See Aimable v. Long and Scott Farms,* 20 F.3d 434, 439 (11th Cir.1994). To that end, we find that the factors used in *Bonnette,* 704 F.2d 1465, provide a useful framework.[9] In *Bonnette,* the court evaluated whether "chore workers" who provided domestic in-home services were employed jointly by the individual recipients for whom they performed services and the state agency administering the program. In concluding that the chore workers were jointly employed, the court looked in particular to four factors: whether the alleged employer (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records. *See id.* at 1470.

The first two *Bonnette* factors address the extent of a putative employer's control over the nature and structure of the working relationship. It is undisputed that Baystate was solely responsible for hiring the temporary workers, and that it had the power to refuse to send a worker back to a job site where he

---

**9.** Plaintiffs posit five factors to be considered as probative of whether, as a matter of economic reality, the workers are their employees: (1) the degree of control exercised by the putative employer over the workers; (2) the workers' opportunity for profit and loss and their investment in the business; (3) the degree of skill and independent initiative required to perform the work; (4) the permanence or duration of the working relationship; and (5) the extent to which the work is an integral part of the employer's business.

These factors have been applied by courts, in various combinations, for the purpose of determining whether a worker is an "employee" or an "independent contractor." *See, e.g., Brock v. Superior Care, Inc.,* 840 F.2d 1054, 1058–59 (2d Cir.1988) (citing cases). The usefulness of the five factors proffered by plaintiffs is significantly limited in this case, however, because the employee/independent contractor choice is no longer before us.

or she had performed unsatisfactorily. The record also establishes that Baystate supervised and controlled employee work schedules and conditions of employment: dictated the times at which workers were to report to the agencies' offices; screened workers for minimum qualifications; decided which workers would be assigned to particular job sites; sometimes transported workers to job sites at client companies; instructed workers about appropriate dress and work habits; and forbade workers from contacting directly a client company about potential job opportunities.

Despite these indicia of Baystate's considerable control over the nature and structure of the relationship with the temporary workers, plaintiffs emphasize that Baystate did not exercise any direct, on-the-job supervision of the workers at the client companies. In these circumstances, we do not perceive the absence of direct supervisory oversight of the workers' day-to-day activities to be dispositive. First, although the client companies were solely responsible for on-site supervision of the workers, Baystate exercised indirect supervisory oversight of the workers through its communications with client companies regarding unsatisfactory performance, occasionally taking workers off the site in the middle of a job. Thus, Baystate retained the authority to intervene if problems arose with a worker's job performance. See Bonnette, 704 F.2d at 1470; see also Superior Care, 840 F.2d at 1060 ("An employer does not need to look over his workers' shoulders every day in order to exercise control."). In any event, it is the totality of the circumstances, and not any one factor, which determines whether a worker is the employee of a particular alleged employer. For these reasons, we conclude that the absence of direct, on-site supervision does not preclude a determination that plaintiffs are the employers of the temporary workers within the broad definition of the FLSA.

Turning next to Bonnette's final two criteria, which address the extent of a putative employer's control over the economic aspects of the working relationship, we note that Baystate exercised unfettered discretion in determining the rate and method of payment. It determined the workers' hourly wage rates (usually minimum wage), required workers to complete and submit time sheets prepared by Baystate and signed by the client companies, and issued the workers' paychecks. Moreover, it is undisputed that Baystate maintained the workers' employment records, and in fact represented to clients in its promotional materials that it would "handle all the burdensome paperwork, bookkeeping, record keeping, payroll costs, and government reporting." In these circumstances, we find no error in the Board's conclusion that the corporate plaintiffs were the temporary workers' employers, within the meaning of the FLSA.

## B. The Individual Plaintiffs' Status as Employers

In addition to determining that the corporate plaintiffs were the temporary workers' "employers," within the meaning of the Act, the Board also concluded that two individual plaintiffs—Harold Woods and Marlene Woods[10]—were their employers as well and thus were personally liable for the alleged violations. As noted previously, more than one employer can be simultaneously responsible for FLSA obligations. A determination that the corporate plaintiffs are employers of the temporary workers does not preclude a determination that others are also "employers" for the purposes of the Act. See Falk, 414 U.S. at 195, 94 S.Ct. 427.

Describing themselves as "mere functionaries who made office decisions which were also made by regular in-house employees in the ordinary course of business," Harold and Marlene contend that they were not "employers" because they had no ownership interest in the corporations and had no "true operational control over any aspects" of the business. The Secretary, however, cites § 3(d)'s

---

**10.** As noted previously, see supra note 8, William Woods has not challenged the agency's determination that he was an employer of the temporary workers (rather, plaintiffs' brief filed with this Court challenges the agency's determination only with respect to Harold Woods, Marlene Woods, and the corporate plaintiffs.) Although it is not clear from plaintiffs' brief, we presume that William concedes his employer status only in the event that we uphold the agency's determination that the corporate plaintiffs are employers, which we have done.

broadly inclusive definition of an employer, see 29 U.S.C. § 203(d) (defining an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee"), and argues that Harold and Marlene fit this definition. The Secretary maintains that the significant factor is whether "the individual exercised control over the work situation." In her view, Harold and Marlene exercised such control, and therefore should be deemed to be employers along with Baystate and hence liable personally for the civil monetary penalty imposed by the Secretary.

In this circuit, our analysis of the personal liability issue is informed by *Donovan v. Agnew*, 712 F.2d 1509 (1st Cir.1983), where we had to decide if appellants Agnew and Bradley, who together were president, treasurer, secretary, and members of the Board of Directors of Maxim Industries, Inc., were personally liable for minimum wage and overtime violations of the FLSA.[11] In *Agnew*, we began our analysis by recognizing that individuals ordinarily are shielded from personal liability when they do business in a corporate form, and that it should not lightly be inferred that Congress intended to disregard this shield in the context of the FLSA. *See id.* at 1513. In this vein, we cautioned that the Act's broadly inclusive definition of "employer" should not be afforded too much weight. "[T]aken literally and applied in this context it would make any supervisory employee, even though without any control over the corporation's payroll, personally liable for the unpaid or deficient wages of other employees." *Id.* Similarly, we found it "difficult to accept, as the Secretary argues and as some courts have apparently held, that Congress intended that any corporate officer or other employee with ultimate operational control over payroll matters be personally liable for the corporation's failure to pay minimum and overtime wages as required by the FLSA." *Id.*

At the same time, however, we also acknowledged that the language of the Act does not support the proposition that officers of a corporation can never be held personally liable for unpaid wages, and we recognized that Congress intended the FLSA's reach to transcend traditional common law parameters of the employer-employee relationship. *See id.* In reaching this conclusion, we observed that the Supreme Court has looked to the "economic reality" of a situation, rather than to "technical" common law concepts, to define the scope of the employer/employee relationship under the Act. *See id.* We further noted that Congress has never contradicted the Court's "economic reality" interpretation of the Act. *See id.* at 1514. Although such Supreme Court cases occurred in the distinguishable context of determining whether an individual should be excluded from the Act's coverage as an independent contractor, we noted that "lower court decisions disregarding the corporate form to find individual corporate officers 'employers' within the meaning of the Act are not of such recent vintage that we can be sure that they have escaped Congress' attention." *Id.*

With these considerations in mind, we decided to apply an "economic reality" test to the *Agnew* personal liability issue. *See id.* Because the inquiry before us concerned personal liability, the well-established elements of the "economic reality" test commonly used to determine whether individuals should be excluded from the Act's coverage because of their status as independent contractors rather than employees, *see, e.g., Superior Care*, 840 F.2d at 1058–59 (citing cases), were not applicable. Instead, we emphasized elements drawn from the facts of the *Agnew* case that we deemed relevant to the personal liability determination. These elements included the significant ownership interest of the corporate officers; their operational control of significant aspects of the corporation's day to day functions, including compensation of employees [12]; and the fact that they personally made decisions to continue operating

---

11. Although *Agnew* concerned personal liability for back wages rather than for civil monetary penalties, we perceive no difference in the applicable legal principles underlying the personal liability determination.

12. For example, Agnew was personally responsible for allowing the company's workers' compensation insurance to lapse in derogation of its legal responsibility, and he personally took responsibility for making banking arrangements when informed that the company's payroll account could not cover its weekly payroll. *See*

the business despite financial adversity and the company's inability to fulfill its statutory obligations to its employees. *See Agnew,* 712 F.2d at 1511–14. Given the presence of these elements, we concluded that Agnew and Bradley were personally liable for the failure to pay minimum and overtime wages as required by the FLSA. *See id.* at 1514.

At bottom, *Agnew*'s economic reality analysis focused on the role played by the corporate officers in causing the corporation to undercompensate employees and to prefer the payment of other obligations and/or the retention of profits. In addition to direct evidence of such a role, other relevant indicia may exist as well—for example, an individual's operational control over significant aspects of the business and an individual's ownership interest in the business. *See, e.g., id.* at 1511–14. Such indicia, while not dispositive, are important to the analysis because they suggest that an individual controls a corporation's financial affairs and can cause the corporation to compensate (or not to compensate) employees in accordance with the FLSA.

Guided by *Agnew*'s application of the economic reality test in the context of the personal liability issue, we must determine whether the Board's factual findings, which are not disputed on appeal, support its legal conclusion that Harold and Marlene are "employers," within the meaning of the Act. The Board set forth the following findings and conclusions:

> Marlene Woods was the manager of All American Temps in Fitchburg responsible for overall supervision of the office. She hired and supervised the permanent employees, and was the contact person for client companies and workers seeking temporary employment. Marlene Woods set the rates charged to the client companies

and purchased insurance for the workers. She gave directions to the workers about on-the-job conduct and exercised the authority on her own initiative to refuse to refer workers to jobs for misconduct, such as drug use or accidentally setting a work area on fire. We find that Marlene Woods exercised sufficient control over the work situation of the day workers to meet the definition of employer in the Act.

> Harold Woods was President, Treasurer and a director of Alternative Staffing, Inc., President of Work–A–Day of Nashua, Treasurer of Work–A–Day of Fitchburg and of Work–A–Day of Lowell. His duties included opening bank accounts, making sales, renewing contacts with prior clients, taking orders for workers, transporting and paying the day workers, and general office duties. We find Harold Woods met the definition of employer under the Act.

(citations omitted).

The Board's findings support the conclusion that Marlene and Harold exercised some degree of supervisory control over the workers, and that they were responsible for overseeing various administrative aspects of the business—in other words, that they had the authority to manage certain aspects of the business's operations on a day-to-day basis. Thus, the Board's findings pertain primarily to Harold's and Marlene's routine supervisory and administrative responsibilities as non-owners of the business. The Board's decision, however, does not address other elements we identified in *Agnew* as important to the personal liability analysis—in particular, the personal responsibility for making decisions about the conduct of the business that contributed to the violations of the Act. The findings do not establish that either Harold or Marlene controlled Baystate's purse-strings or made corporate policy about Baystate's compensation practices.[13]

*Agnew,* 712 F.2d at 1511. Bradley personally supervised the company's cash flow, was personally involved in decisions about layoffs and employee overtime hours, and met frequently with the union president about the company's failure to make payments to the employees' pension plan, health insurance plan, and workers' compensation program. *See id.*

**13.** *Cf., e.g., United States Dep't of Labor v. Cole Enters. Inc.,* 62 F.3d 775, 778–79 (6th Cir.1995)(corporate officer with significant own-

ership interest held to be "employer," where individual was engaged in running the business, was authorized to issue checks on the corporate accounts, had custody and control with his wife of the employment records and was responsible for maintaining those records, and determined with his wife the employment practices for the business, including hiring, firing, rates of pay and hours of work); *Dole v. Elliott Travel & Tours, Inc.,* 942 F.2d 962, 965–66 (6th Cir.1991) (corporate officer with significant ownership interest held to be "employer," where evidence

The Board's findings reflect the literal application of the definition of an employer we warned against in *Agnew*—"any person acting directly or indirectly in the interest of an employer in relation to an employee." *See Agnew*, 712 F.2d at 1513 (quoting 29 U.S.C. § 203(d)). If, as the Secretary argues, the significant factor in the personal liability determination is simply the exercise of control by a corporate officer or corporate employee over the "work situation," almost any supervisory or managerial employee of a corporation could be held personally liable for the unpaid wages of other employees and the civil penalty related thereto. We adhere to the view expressed in *Agnew* that such an expansive application of the definition of an "employer" to a personal liability determination pursuant to the FLSA is untenable.

■ When an agency makes an error of law in its administrative proceedings, a reviewing court may remand the case to the agency so that the agency may take further action consistent with the correct legal standards. *See South Prairie Constr. Co. v. Local No. 627, Int'l Union of Operating Eng'rs*, 425 U.S. 800, 806, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976) (per curiam); *Cissell Mfg. Co. v. United States Dep't of Labor*, 101 F.3d 1132, 1136–37 (6th Cir.1996)(citing cases). In this case, the Board's personal liability determination relating to the corporate employees reflects a misperception of the critical components of the personal liabili-

ty analysis identified in *Donovan v. Agnew*, 712 F.2d 1509, and elaborated herein. Because there is no basis for concluding that the Board would have reached the same result had it applied the correct legal standard, *cf. NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 766 n. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969), we remand to the district court with instructions that it, in turn, remand to the Secretary for reconsideration consistent herewith of the personal liability of Harold and Marlene Woods for any civil penalty imposed.

### C. Willfulness of the Violations

■ Alternatively, plaintiff-appellants argue that even if the temporary workers were their employees, the Board erred in finding that plaintiffs "willfully" violated the FLSA's overtime compensation provisions, within the meaning of § 16(e) of the Act. Citing the well-established test of a "willful violation" articulated in *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988) (holding that an employer acts willfully for the purposes of the FLSA's statute of limitations if it "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the FLSA"),[14] the Board concluded that plaintiffs either knew that their conduct was prohibited by the FLSA, or showed a reckless disregard for that possibility. In reaching this

established that individual was the "top man" at the corporation, that he had control over significant aspects of the corporation's day-to-day functions, including determining employee salaries, and that the corporation functioned for his profit); *Donovan v. Grim Hotel Co.*, 747 F.2d 966, 971–72 (5th Cir.1984)(corporate officer with no ownership interest held to be "employer" where, *inter alia*, he began and controlled the corporations, held their purse-strings, and guided their policies, and where, "speaking pragmatically, [the corporations] were [his] and functioned for the profit of his family" ); *Donovan v. Sabine Irrigation Co.*, 695 F.2d 190, 194–95 (5th Cir. 1983) (corporate officer with no ownership interest held to be "employer," where individual exercised pervasive control over the business and financial affairs of the corporation, indirectly controlled many matters traditionally handled by an employer (such as payroll, insurance, and income tax matters), and where "the corporation's very survival depended upon [his] largesse,

with his decision to terminate all financial aid precipitating its near demise").

14. We note that neither party cites any case in which the term "willful" has been construed for the purposes of § 16(e)'s civil penalty provision. Nonetheless, both parties apparently acknowledge the applicability in the civil penalty context of the standard of willfulness adopted in *Richland Shoe*, 486 U.S. 128, 108 S.Ct. 1677, 100 L.Ed.2d 115, in which the Court held that an employer acts willfully for the purposes of the FLSA's statute of limitations if it "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Id.* at 133, 108 S.Ct. 1677. Finding no legislative history to support a contrary conclusion, we agree that *Richland Shoe*'s test of a willful violation, which arose in the non-punitive context of the FLSA's statute of limitations, must also be applicable in the punitive context of § 16(e)'s civil penalty provision. *See Atlantic Cleaners & Dyers v. United States*, 286 U.S. 427, 433, 52 S.Ct. 607, 76 L.Ed. 1204 (1932).

conclusion, the Board relied on examples set forth in 29 C.F.R. § 578.3(c),[15] a regulation based on the *Richland Shoe* standard which defines the term "willful violation" for the purposes of § 16(e)'s civil penalty provision. *See* 57 Fed.Reg. 49,128 (1992)(supplementary information) (stating that the regulation's definition of a "willful" violation is based on the *Richland Shoe* decision).

First, citing 29 C.F.R. § 578.3(c)(2), the Board observed that during the 1989–1990 and 1992 investigations the Wage and Hour Division put plaintiffs on notice that plaintiffs' recordkeeping practices and overtime compensation practices violated the Act, and in fact gave plaintiffs a Wage and Hour Division publication which stated that temporary help companies are the joint employers of the workers they place. The Board reasoned that the Wage and Hour Division's notice to plaintiffs "was sufficient under [29 C.F.R. § 578.3(c)(2) ] to find that plaintiffs willfully violated the Act." Second, the Board rejected plaintiffs' contention that their alleged violations were not "willful," within the meaning of § 16(e), because they relied on the opinion of Baystate's attorney and accountant that the temporary workers were not covered by the Act. Citing 29 C.F.R. § 578.3(c)(3), the Board found that plaintiffs' reliance on such opinions "was not sufficient" after the Wage and Hour Division advised them that they were required to pay overtime compensation to the temporary workers, and that plaintiffs' failure to make "further inquiries"—over and above obtaining the advice of a professional—constituted a reckless disregard of the requirements of the Act.

Although neither party challenges or defends 29 C.F.R. § 578.3(c)'s examples of "willful" violations, we note their incongruity with the *Richland Shoe* standard on which

the regulation is based. Pursuant to section 578.3(c)(2), an employer "knowingly" violates the FLSA if its actions are at variance with advice received from a responsible official of the Wage and Hour Division. *See* 29 C.F.R. § 578.3(c)(2). On its face, such a standard precludes legitimate disagreement between a party and the Wage and Hour Division about whether the party is an employer covered by the Act, leaving a putative employer in an untenable position: either accept the Wage and Hour Division's position and comply with its advice, or risk a finding of a willful violation of the Act. Whether the FLSA covers a particular putative employer has engendered considerable litigation, which has in turn given rise to various court-fashioned tests of employer status. These tests are by necessity fact-driven and context-specific, and in some cases there may be room for legitimate disagreement between a party and the Wage and Hour Division as to whether the party is an employer within the meaning of the FLSA. Because legitimate disagreement may exist about the Act's coverage, we have significant reservations about 29 C.F.R. § 578.3(c)(2)'s blanket assertion that a party's decision not to comply with the Wage and Hour Division's advice constitutes a "knowing" violation of the Act under the *Richland Shoe* standard.

Furthermore, pursuant to 29 C.F.R. § 578.3(c)(3), an employer shows "reckless disregard" for the requirements of the Act if it "should have inquired further into whether its conduct was in compliance with the Act, and failed to make adequate further inquiry." 29 C.F.R. § 578.3(c)(3). Although it is possible to envision circumstances in which a failure to make further inquiry into the legality of one's conduct might constitute a reckless disregard of the FLSA, section 578.3(c)(3) by its terms—specifically, that a party "should

---

15. 29 C.F.R. § 578.3(c) provides in pertinent part:

(c) *Willful violations.*
(1) An employer's violation of section 6 or section 7 of the Act shall be deemed to be "willful" for the purposes of this section where the employer knew that its conduct was prohibited by the Act or showed reckless disregard for the requirements of the Act. . . .
(2) For the purposes of this section, an employer's conduct shall be deemed knowing,

among other situations, if the employer received advice from a responsible official of the Wage and Hour Division to the effect that the conduct in question is not lawful.
(3) For the purposes of this section, an employer's conduct shall be deemed to be in reckless disregard of the requirements of the Act, among other situations, if the employer should have inquired further into whether its conduct was in compliance with the Act, and failed to make adequate further inquiry.

have inquired further" about the legality of its conduct—embraces a negligence standard of liability. The *Richland Shoe* Court, however, expressly rejected a negligence standard of liability, *see Richland Shoe*, 486 U.S. at 133–35, 108 S.Ct. 1677, and noted that an employer does not act willfully even if it acts unreasonably in determining whether it is in compliance with the FLSA, *see id.* at 135 n. 13, 108 S.Ct. 1677.

At best, the regulation's examples of "willfulness" are incomplete and unhelpful, and we are troubled by the Board's considerable reliance on them in reaching its conclusion that plaintiffs willfully violated the FLSA's overtime compensation provisions. To the extent that the Board failed to take into consideration the *Richland Shoe* standard of willfulness by placing undue weight on the regulation's dubious examples of such conduct, it did not apply the appropriate standard to the willfulness determination. Accordingly, we conclude that a remand is necessary to permit the Board to take further action consistent with the correct legal standard of a "willful violation" embodied in the *Richland Shoe* decision.[16]

### III. CONCLUSION

Finding no error in the Board's conclusion that the corporate plaintiffs were "employers" of the temporary workers, we affirm the district court's grant of a summary judgment in favor of the Secretary on that issue. With respect to the personal liability and willfulness issues, however, we remand to the district court with instructions that it, in turn, remand this case to the Secretary for further proceedings consistent herewith.[17]

*Affirmed in part, vacated in part, and remanded. All parties to bear their own costs.*

---

**16.** Although we refrain from ruling on the validity of the regulation's examples given the parties' failure to identify and brief the issue, we urge the Secretary to reconsider the examples of "willful violations" contained in 29 C.F.R. § 578.3(c) to ensure that they comport with the Court's reading of the statutory term "willful" in *Richland Shoe.*

**17.** Plaintiffs also argue that the ALJ's decision improperly incorporated the Secretary's post-hearing brief without alteration and that the Board failed to make sufficient findings of fact to support its "joint employer" determination, resulting in a violation of their due process rights. These contentions are without merit and we do not address them further.