USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-1084

BAYSTATE ALTERNATIVE STAFFING, INC., ABLE TEMPS REFERRALS, INC.,
 HAROLD WOODS, WILLIAM W. WOODS, AND MARLENE WOODS,

 Plaintiff-Appellants,

 v.

 ALEXIS M. HERMAN, SECRETARY OF LABOR, 
 UNITED STATES DEPARTMENT OF LABOR,

 Defendant-Appellee.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Nathaniel M. Gorton, U.S. District Judge]

 Before

 Selya, Boudin, and Lipez,
 Circuit Judges
 
 

 Edward DeFranceschi, for appellant.
 Ellen R. Edmond, with whom Marvin Krislov, Deputy Solicitor
for National Operations, Steven J. Mandel, Associate Solicitor,
Paul L. Frieden, Counsel for Appellate Litigation, were on brief
for appellee Secretary of Labor.

December 30, 1998

 
 LIPEZ, Circuit Judge. This appeal involves an action brought
in the district court under the Administrative Procedure Act
("APA"), 5 U.S.C. 701 et seq., seeking review of a final
administrative determination by the Department of Labor's
Administrative Review Board (the Board) that Baystate Alternative
Staffing, Inc., Able Temps Referrals, Inc., William Woods, Harold
Woods, and Marlene Woods willfully violated the overtime
compensation provisions of the Fair Labor Standards Act (FLSA), 29
U.S.C. 201 et seq., and therefore were subject to civil monetary
penalties pursuant to 29 U.S.C. 216(e). Plaintiff-appellants,
who were engaged in the business of providing unskilled workers to
factories, cleaning companies, and similar entities in need of
temporary labor, maintain that the district court erred by
affirming the ruling of the Board that the corporate appellants,
Harold Woods, and Marlene Woods were the temporary workers'
"employers," within the meaning of the FLSA. Alternatively,
plaintiff-appellants argue that the court erred by affirming the
Board's conclusion that their alleged violations were "willful,"
within the meaning of 16(e) of the Act. 
 We find no error in the court's affirmance of the Board's
ruling that the corporate appellants were "employers" of the
temporary workers. We conclude, however, that the Board
misperceived the legal standards to be applied to the issues of
whether Harold Woods and Marlene Woods were personally liable for
civil penalties as "employers" of the temporary workers and whether
the conduct of the plaintiff-appellants was "willful," within the
meaning of 16(e). We therefore vacate those portions of the
court's judgment resolving those issues and order a remand of this
case to the Board for reconsideration of the personal liability and
willfulness issues under the correct legal standards. 

I. BACKGROUND
 A. The Employment Agencies
 Beginning in the early 1980s William Woods formed and
operated approximately ten temporary employment agencies, including
plaintiff-appellants Baystate Alternative Staffing, Inc. and Able
Temps Referral, Inc. (referred to collectively herein as
"Baystate"), in Massachusetts and New Hampshire. After founding
the agencies, William was assisted in their operation by his son,
Harold Woods, his sister, Ann Woods, and his wife, Marlene Woods,
who served the agencies in various capacities as corporate officers
and/or managers.
 Each of the Baystate agencies was managed in a similar
fashion. Baystate advertised its services to companies in need of
temporary workers to perform unskilled labor, including industrial
and factory work, heavy labor, and assembly and packing. Baystate
generally charged its client companies between $6.00 and $7.50 per
hour for the services of the workers; from this amount, Baystate
usually paid the workers the minimum wage, keeping the premium for
itself. Baystate's advertisements represented that it would
"handle all the burdensome paperwork, bookkeeping, record keeping,
payroll costs, and government reporting." Baystate also informed
potential customers that it would provide workers' compensation
coverage for the workers, and that it would transport the workers
to and from the work site. To obtain temporary workers, client
companies called one of Baystate's offices with a job order
requesting a specified number of workers.
 Baystate required all job applicants seeking temporary
work to sign a "Contractor Agreement," which stated that the worker
was an independent contractor and not an employee of Baystate. A
memorandum attached to the agreement set forth the rules and
regulations all workers were required to follow. The memorandum
warned that if a worker contacted a client company on his or her
own initiative about potential job opportunities, without the
involvement of Baystate, the worker would not be placed with a
client company in the future. It also prescribed rules on
completing and submitting time cards to Baystate, informed workers
when they were to present themselves at Baystate's offices for work
assignments and how they would be transported to and from job
sites, and instructed workers about appropriate clothing and
behavior at job sites. 
 Although Baystate issued the workers' paychecks and
apparently provided some type of workers' compensation insurance
for the workers, it concedes that it did not pay the workers time-
and-one-half their regular rates for hours they worked in excess of
forty per week. It also did not deduct federal or state income
taxes from the workers' paychecks, contribute to the workers'
social security accounts, or pay any state unemployment insurance
on the workers' behalf.

 B. The DOL Investigations
 1. The 1989 Investigation 
 In 1989 William Pickett, Jr., an investigator from the
Wage and Hour Division of the Department of Labor, initiated an
investigation of Able Temps. Pickett first met with James Walsh,
Able Temps' attorney, at Walsh's office on December 5, 1989. At
this meeting, Walsh provided Pickett with the payroll records for
Able Temps' "in-house employees" - that is, individuals who were
employed by Able Temps as clerks, telemarketers, or in other in-
house capacities. Able Temps acknowledged these in-house employees
were its "employees," within the meaning of the FLSA. Pickett
examined the in-house employees' payroll records and determined
that they were being paid in compliance with the FLSA. 
 Pickett informed Walsh that he also needed the payroll
records of the temporary workers. Walsh stated that he had been
unaware that Pickett would need the temporary workers' records, and
that he did not have the information available at that time. In
the absence of the temporary workers' payroll records, Pickett and
Walsh proceeded to discuss in general terms whether the temporary
workers were Able Temps' "employees," within the meaning of the
FLSA. Pickett gave Walsh a copy of the Wage and Hour Division's
publication entitled "Employment Relationship Under the Fair Labor
Standards Act," which set forth a six-factor test used to
distinguish between independent contractors and employees. 
 After discussing the general criteria used by the Wage
and Hour Division to determine whether an employment relationship
exists between a worker and an alleged employer, Pickett told Walsh
that he suspected that Able Temps' temporary workers were its
"employees," within the meaning of the FLSA. Walsh disagreed with
Pickett's position, and stated his belief that the temporary
workers were not Able Temps' employees. As the meeting concluded,
Walsh stated that he would contact Able Temps to try to obtain the
temporary workers' payroll records.
 After calling Walsh's office several times to inquire
about the temporary workers' payroll records, Pickett received in
early February 1990 a list of names and addresses for 109 temporary
workers and a computer disk containing some of the requested
payroll information. Because the payroll records were incomplete,
Pickett determined that Able Temps' record keeping practices were
not in compliance with the FLSA. In April 1990, Pickett informed
Walsh that although Pickett suspected that Able Temps had violated
the FLSA's overtime provisions, the incomplete state of the payroll
records did not allow him to confirm his suspicions. Pickett told
Walsh that the Wage and Hour Division "would like [Able Temps] to
enter into a stipulation so that we cannot have this problem in the
future." 
 On April 30, 1990, Able Temps and the DOL executed a
stipulation which stated, inter alia, that Able Temps would
"maintain an accurate record of daily and weekly hours worked for
all employees," and that it would "henceforth comply with the
Recordkeeping provisions of Section 11(c), the minimum wage
provisions of Section 6, and the overtime provisions of Section 7
of the [FLSA]." The stipulation also stated that "[n]either the
execution of this Stipulation nor the performance by the Company of
any of its obligations above shall constitute or be construed as an
admission by the Company that it has violated any provisions of the
Act and such execution and performance shall be without prejudice
to the Company's position in this respect." Walsh testified that
he believed the stipulation did not prejudice the position of Able
Temps that the temporary workers were independent contractors, and
that he communicated this opinion to his client. 
 2. The 1992 Investigation 
 In 1992 Pickett initiated a second investigation of the
Woodses' temporary employment business, whose activities were now
being conducted through an entity called Alternative Staffing, Inc. 
Pickett met on several occasions with John Bresnahan, Alternative
Staffing's accountant. Pickett gave Bresnahan a copy of the DOL's
pamphlet "Employment Relationship Under the Fair Labor Standards
Act," the same pamphlet he had given to Walsh in 1989, and informed
Bresnahan that his "determination had been and would probably be
this time that [the temporary workers] were still employees of
[Alternative Staffing]." Bresnahan disagreed with Pickett,
asserting that Alternative Staffing did not exercise sufficient
control over the temporary workers to be their employer. Bresnahan
informed William Woods and James Walsh of Pickett's position, and
of his (Bresnahan's) opinion that the temporary workers were not
Alternative Staffing's employees. 
 In December 1992, Pickett began a protracted effort to
obtain the payroll records of the temporary workers from
Alternative Staffing. After having little success in obtaining the
records, Pickett served Harold Woods with a subpoena duces tecum in
March 1993. Woods failed to comply with the subpoena, and Pickett
obtained an order from the district court in July 1993 mandating
compliance. In September 1993, Pickett was promoted and Patricia
Colarossi was assigned to continue the Alternative Staffing
investigation. Colarossi continued to experience difficulty
obtaining all the records requested in the subpoena. Based on the
information that had been provided to her, however, Colarossi
determined that Alternative Staffing had failed to pay 619
temporary workers overtime compensation during the period from
September 1991 to July 1994. Colarossi also recommended, with her
supervisor's concurrence, that Baystate and four members of the
Woods family William, Harold, Marlene, and Ann be assessed
civil monetary penalties for "willful violations," pursuant to 
 16(e) of the FLSA. 

 C. Procedural History
 Following the Wage and Hour Administrator's assessment of
a $150,000 civil monetary penalty against Baystate and the Woodses
for willful violations of the FLSA's overtime provisions,
plaintiffs filed a timely exception. Pursuant to 29 C.F.R.
 580.10, the matter was referred for a hearing before an
administrative law judge ("ALJ"). In June 1996 the ALJ issued a
Decision and Order affirming the Administrator's assessment. In
the decision, the ALJ held that the temporary workers were the
employees of Baystate and were not independent contractors; that
William, Harold, Marlene, and Ann Woods were employers in their
individual capacities of the temporary workers, and were thus
personally liable for the assessment; and that the FLSA violations
were willful, within the meaning of 29 U.S.C. 216(e).
 Baystate, William Woods, Harold Woods, Marlene Woods, and
Ann Woods thereafter appealed the ALJ's decision to the Board,
which the Secretary has designated to issue final agency decisions
under 16(e) of the FLSA. See 29 C.F.R. 2.6, 580.13. The
Board affirmed the ALJ's determination that the temporary workers
were Baystate's employees, not independent contractors. The Board
also affirmed the ALJ's determination that Harold and Marlene Woods
were individually liable for the assessment as employers of the
temporary workers. The Board reversed, however, the ALJ's
conclusion that Ann Woods was an employer of the temporary
workers. Finally, the Board affirmed the ALJ's conclusion that
the FLSA violations were willful, within the meaning of 16(e).
 Baystate, William Woods, Harold Woods, and Marlene Woods
thereafter brought an action in the district court seeking review
of the Board's decision pursuant to the APA, 5 U.S.C. 701 et seq. 
In their complaint, plaintiffs asserted that the Board's
conclusions that (1) their alleged violations were "willful" and
that (2) Baystate, Harold, and Marlene were the temporary workers'
"employers," within the meaning of the FLSA, were not in accordance
with applicable law. After the parties filed cross-motions for a
summary judgment, the district court rejected plaintiffs'
contentions and granted a summary judgment in favor of the
Secretary. This appeal followed. 

II. DISCUSSION
 Pursuant to 16(b) of the FLSA, any employer who
violates the overtime compensation or minimum wage provisions of
sections 6 or 7 is liable to the employee or employees affected in
the amount of their unpaid minimum wages or overtime compensation,
plus an additional equal amount as liquidated damages. See 29
U.S.C. 216(b). In 1989, Congress amended the Act to authorize
the imposition of a civil penalty on "any person who repeatedly or
willfully violates" the overtime compensation and minimum wage
provisions of sections 6 and 7. See 29 U.S.C. 216(e). 
 Plaintiffs challenge the imposition of civil penalties on
two independently sufficient grounds. First, they contend that the
district court erred by affirming the Board's ruling that the
temporary workers were Baystate's, Harold Woods', and Marlene
Woods' "employees," within the meaning of the Act, and that the
temporary workers thus fell within the scope of the FLSA's
provisions. Alternatively, plaintiffs argue that even if the
temporary workers were their employees, the district court erred by
affirming the Board's finding that Baystate, Harold Woods, Marlene
Woods, and William Woods "willfully" violated the FLSA's overtime
compensation provisions, within the meaning of 16(e) of the Act. 
As set forth below, we agree in part.

 A. Corporate Plaintiffs' Status as "Employers"
 1. Standard of Review
 In the administrative law context, where we review
directly the decision of the agency, the APA can serve as an
overlay to the familiar de novo standard applicable to appeals from
a district court's grant of a summary judgment. See Associated
Fisheries of Maine, Inc. v. Daley, 127 F.3d 104, 109 (1st Cir.
1997). Where the APA obtains, as here, a court may set aside an
administrative action only if that action is arbitrary, capricious,
or otherwise contrary to law. See 5 U.S.C. 706(2)(A)-(D);
Associated Fisheries, 127 F.3d at 109; see also Commonwealth of
Mass. Dep't of Pub. Welfare v. Secretary of Agric., 984 F.2d 514,
525 (1st Cir. 1993). Thus, in our direct review of the agency's
decision, we employ the same standard of review that was applicable
before the district court. 
 In this case, plaintiffs apparently do not challenge the
Board's factual findings, but rather argue that those facts do not
support the Board's conclusion that Baystate was an "employer" of
the temporary workers. In so arguing, plaintiffs challenge the
Board's application of the law to established facts. We have
previously noted that some question exists about the proper level
of deference to accord agency decisions of this sort. See Carr
Investments, Inc. v. Commodity Futures Trading Comm'n, 87 F.3d 9,
12-13 (1st Cir. 1996); see also Maloley v. R.J. O'Brien & Assocs.,
Inc., 819 F.2d 1435, 1440 (8th Cir. 1987) (observing that "[a]s to
the proper standard of review of an agency's application of law to
undisputed or established facts, it has been noted that the Supreme
Court has developed two opposing lines of authority"); seegenerally 5 K. Davis, Administrative Law Treatise, 29.9-.10, at
365-81 (2d ed. 1984) (discussing scope of review problems that
arise when law is applied to undisputed or established facts). 
While we are aware that such uncertainties exist concerning the
proper standard to be applied to an agency's application of law to
established facts, we need not resolve the matter here. Rather,
because we find that the Board's decision with respect to the
corporate plaintiffs survives even a more probing de novo standard
of review, we have no occasion to traverse this difficult terrain. 
Cf., e.g., Carr Investments, 87 F.3d at 12-13 (refraining from
deciding what level of deference should be applied to agency's
application of law to facts, where agency's decision could not
survive even under the more deferential standard). 
 2. Corporate Plaintiffs' Employer Status
 Throughout the course of this litigation, plaintiffs
maintained that the temporary workers were in fact "independent
contractors," not employees, and that the FLSA's overtime
compensation provisions therefore are inapplicable. Using a six-
factor test commonly used to distinguish between independent
contractors and employees in the context of the FLSA, see, e.g.,
Martin v. Selker Bros., Inc., 949 F.2d 1286, 1293 (3d Cir. 1991),
the Board rejected plaintiffs' contention and concluded that the
workers were "employees" within the meaning of the Act. At oral
argument, plaintiffs finally conceded this point, but continued to
insist that the workers were the employees only of the client
companies for whom they performed labor, rather than the employees
of plaintiffs. The Board had also rejected this contention. We
affirm the Board's conclusion that the corporate plaintiffs were
employers of the temporary workers, notwithstanding the alleged
simultaneous employer status of the client companies. 
 The Act defines an "employee" as "any individual employed
by an employer." 29 U.S.C. 203(e)(1). An "employer" is defined
as "any person acting directly or indirectly in the interest of an
employer in relation to an employee . . . ." Id. 203(d). The Act
further states that the term "employ" includes "to suffer or permit
to work." Id. 203(g). In determining the scope of the Act,
courts have consistently recognized that "a broader or more
comprehensive coverage of employees within the stated categories
would be difficult to frame." United States v. Rosenwasser, 323
U.S. 360, 362 (1945). These definitions ". . . [are] comprehensive
enough to require [their] application to many persons and working
relationships, which prior to this Act, were not deemed to fall
within an employer-employee category." Rutherford Food Corp., 331
U.S. at 729 (quoting Walling v. Portland Terminal Co., 330 U.S.
148, 150 (1947)). Moreover, the remedial purposes of the FLSA
require courts to define "'employer' more broadly than the term
would be interpreted in traditional common law applications." Dolev. Elliott Travel & Tours, Inc., 942 F.2d 962, 965 (6th Cir. 1991).
The FLSA contemplates several simultaneous employers, each
responsible for compliance with the Act. See Falk v. Brennan, 414
U.S. 190, 195 (1973); Bonnette, 704 F.2d at 1469-70 (9th Cir.
1983); see also 29 C.F.R. 791.2(a).
 Accordingly, to determine whether an employment
relationship exists for the purposes of federal welfare
legislation, courts look not to the common law conceptions of that
relationship, but rather to the "economic reality" of the totality
of the circumstances bearing on whether the putative employee is
economically dependent on the alleged employer. See Aimable v.
Long and Scott Farms, 20 F.3d 434, 439 (11th Cir. 1994). To that
end, we find that the factors used in Bonnette v. California Health
and Welfare Agency, 704 F.2d 1465 (9th Cir. 1983), provide a useful
framework. In Bonnette, the court evaluated whether "chore
workers" who provided domestic in-home services were employed
jointly by the individual recipients for whom they performed
services and the state agency administering the program. In
concluding that the chore workers were jointly employed, the court
looked in particular to four factors: whether the alleged employer
(1) had the power to hire and fire the employees; (2) supervised
and controlled employee work schedules or conditions of employment;
(3) determined the rate and method of payment; and (4) maintained
employment records. See id. at 1470.
 The first two Bonnette factors address the extent of a
putative employer's control over the nature and structure of the
working relationship. It is undisputed that Baystate was solely
responsible for hiring the temporary workers, and that it had the
power to refuse to send a worker back to a job site where he or she
had performed unsatisfactorily. The record also establishes that
Baystate supervised and controlled employee work schedules and
conditions of employment: dictated the times at which workers were
to report to the agencies' offices; screened workers for minimum
qualifications; decided which workers would be assigned to
particular job sites; sometimes transported workers to job sites at
client companies; instructed workers about appropriate dress and
work habits; and forbade workers from contacting directly a client
company about potential job opportunities.
 Despite these indicia of Baystate's considerable control
over the nature and structure of the relationship with the
temporary workers, plaintiffs emphasize that Baystate did not
exercise any direct, on-the-job supervision of the workers at the
client companies. In these circumstances, we do not perceive the
absence of direct supervisory oversight of the workers' day-to-day
activities to be dispositive. First, although the client companies
were solely responsible for on-site supervision of the workers,
Baystate exercised indirect supervisory oversight of the workers
through its communications with client companies regarding
unsatisfactory performance, occasionally taking workers off the
site in the middle of a job. Thus, Baystate retained the authority
to intervene if problems arose with a worker's job performance. 
See Bonnette, 704 F.2d at 1470; see also Superior Care, 840 F.2d at
1060 ("An employer does not need to look over his workers'
shoulders every day in order to exercise control."). In any event,
it is the totality of the circumstances, and not any one factor,
which determines whether a worker is the employee of a particular
alleged employer. For these reasons, we conclude that the absence
of direct, on-site supervision does not preclude a determination
that plaintiffs are the employers of the temporary workers within
the broad definition of the FLSA.
 Turning next to Bonnette's final two criteria, which
address the extent of a putative employer's control over the
economic aspects of the working relationship, we note that Baystate
exercised unfettered discretion in determining the rate and method
of payment. It determined the workers' hourly wage rates (usually
minimum wage), required workers to complete and submit time sheets
prepared by Baystate and signed by the client companies, and issued
the workers' paychecks. Moreover, it is undisputed that Baystate
maintained the workers' employment records, and in fact represented
to clients in its promotional materials that it would "handle all
the burdensome paperwork, bookkeeping, record keeping, payroll
costs, and government reporting." In these circumstances, we find
no error in the Board's conclusion that the corporate plaintiffs
were the temporary workers' employers, within the meaning of the
FLSA.

 B. The Individual Plaintiffs' Status as Employers
 In addition to determining that the corporate plaintiffs
were the temporary workers' "employers," within the meaning of the
Act, the Board also concluded that two individual plaintiffs 
Harold Woods and Marlene Woods were their employers as well and
thus were personally liable for the alleged violations. As noted
previously, more than one employer can be simultaneously
responsible for FLSA obligations. A determination that the
corporate plaintiffs are employers of the temporary workers does
not preclude a determination that others are also "employers" for
the purposes of the Act. See Falk, 414 U.S. at 195. 
 Describing themselves as "mere functionaries who made
office decisions which were also made by regular in-house employees
in the ordinary course of business," Harold and Marlene contend
that they were not "employers" because they had no ownership
interest in the corporations and had no "true operational control
over any aspects" of the business. The Secretary, however, cites
 3(d)'s broadly inclusive definition of an employer, see 29 U.S.C.
 203(d)(defining an "employer" as "any person acting directly or
indirectly in the interest of an employer in relation to an
employee"), and argues that Harold and Marlene fit this definition. 
The Secretary maintains that the significant factor is whether "the
individual exercised control over the work situation." In her
view, Harold and Marlene exercised such control, and therefore
should be deemed to be employers along with Baystate and hence
liable personally for the civil monetary penalty imposed by the
Secretary.
 In this circuit, our analysis of the personal liability
issue is informed by Donovan v. Agnew, 712 F.2d 1509 (1st Cir.
1983), where we had to decide if appellants Agnew and Bradley, who
together were president, treasurer, secretary, and members of the
Board of Directors of Maxim Industries, Inc., were personally
liable for minimum wage and overtime violations of the FLSA. In
Agnew, we began our analysis by recognizing that individuals
ordinarily are shielded from personal liability when they do
business in a corporate form, and that it should not lightly be
inferred that Congress intended to disregard this shield in the
context of the FLSA. See id. at 1513. In this vein, we cautioned
that the Act's broadly inclusive definition of "employer" should
not be afforded too much weight. "[T]aken literally and applied in
this context it would make any supervisory employee, even though
without any control over the corporation's payroll, personally
liable for the unpaid or deficient wages of other employees." Id. Similarly, we found it "difficult to accept, as the Secretary
argues and as some courts have apparently held, that Congress
intended that any corporate officer or other employee with ultimate
operational control over payroll matters be personally liable for
the corporation's failure to pay minimum and overtime wages as
required by the FLSA." Id. 
 At the same time, however, we also acknowledged that the
language of the Act does not support the proposition that officers
of a corporation can never be held personally liable for unpaid
wages, and we recognized that Congress intended the FLSA's reach to
transcend traditional common law parameters of the employer-
employee relationship. See id. In reaching this conclusion, we
observed that the Supreme Court has looked to the "economic
reality" of a situation, rather than to "technical" common law
concepts, to define the scope of the employer/employee relationship
under the Act. See id. We further noted that Congress has never
contradicted the Court's "economic reality" interpretation of the
Act. See id. at 1514. Although such Supreme Court cases occurred
in the distinguishable context of determining whether an individual
should be excluded from the Act's coverage as an independent
contractor, we noted that "lower court decisions disregarding the
corporate form to find individual corporate officers 'employers'
within the meaning of the Act are not of such recent vintage that
we can be sure that they have escaped Congress' attention." Id.
 With these considerations in mind, we decided to apply an
"economic reality" test to the Agnew personal liability issue. Seeid. Because the inquiry before us concerned personal liability,
the well-established elements of the "economic reality" test
commonly used to determine whether individuals should be excluded
from the Act's coverage because of their status as independent
contractors rather than employees, see, e.g., Superior Care, 840
F.2d at 1058-59 (citing cases), were not applicable. Instead, we
emphasized elements drawn from the facts of the Agnew case that we
deemed relevant to the personal liability determination. These
elements included the significant ownership interest of the
corporate officers; their operational control of significant
aspects of the corporation's day to day functions, including
compensation of employees; and the fact that they personally made
decisions to continue operating the business despite financial
adversity and the company's inability to fulfill its statutory
obligations to its employees. See Agnew, 712 F.2d at 1511-14.
Given the presence of these elements, we concluded that Agnew and
Bradley were personally liable for the failure to pay minimum and
overtime wages as required by the FLSA. See id. at 1514. 
 At bottom, Agnew's economic reality analysis focused on
the role played by the corporate officers in causing the
corporation to undercompensate employees and to prefer the payment
of other obligations and/or the retention of profits. In addition
to direct evidence of such a role, other relevant indicia may exist
as well for example, an individual's operational control over
significant aspects of the business and an individual's ownership
interest in the business. See, e.g., id. at 1511-14. Such
indicia, while not dispositive, are important to the analysis
because they suggest that an individual controls a corporation's
financial affairs and can cause the corporation to compensate (or
not to compensate) employees in accordance with the FLSA.
 Guided by Agnew's application of the economic reality
test in the context of the personal liability issue, we must
determine whether the Board's factual findings, which are not
disputed on appeal, support its legal conclusion that Harold and
Marlene are "employers," within the meaning of the Act. The Board
set forth the following findings and conclusions:
 Marlene Woods was the manager of All American Temps in
 Fitchburg responsible for overall supervision of the
 office. She hired and supervised the permanent employees,
 and was the contact person for client companies and
 workers seeking temporary employment. Marlene Woods set
 the rates charged to the client companies and purchased
 insurance for the workers. She gave directions to the
 workers about on-the-job conduct and exercised the
 authority on her own initiative to refuse to refer
 workers to jobs for misconduct, such as drug use or
 accidentally setting a work area on fire. We find that
 Marlene Woods exercised sufficient control over the work
 situation of the day workers to meet the definition of
 employer in the Act.
 Harold Woods was President, Treasurer and a director of
 Alternative Staffing, Inc., President of Work-A-Day of
 Nashua, Treasurer of Work-A-Day of Fitchburg and of Work-
 A-Day of Lowell. His duties included opening bank
 accounts, making sales, renewing contacts with prior
 clients, taking orders for workers, transporting and
 paying the day workers, and general office duties. We
 find Harold Woods met the definition of employer under
 the Act. 

(citations omitted).
 The Board's findings support the conclusion that Marlene
and Harold exercised some degree of supervisory control over the
workers, and that they were responsible for overseeing various
administrative aspects of the business in other words, that they
had the authority to manage certain aspects of the business's
operations on a day-to-day basis. Thus, the Board's findings
pertain primarily to Harold's and Marlene's routine supervisory and
administrative responsibilities as non-owners of the business. The
Board's decision, however, does not address other elements we
identified in Agnew as important to the personal liability analysis
 in particular, the personal responsibility for making decisions
about the conduct of the business that contributed to the
violations of the Act. The findings do not establish that either
Harold or Marlene controlled Baystate's purse-strings or made
corporate policy about Baystate's compensation practices. 
 The Board's findings reflect the literal application of
the definition of an employer we warned against in Agnew "any
person acting directly or indirectly in the interest of an employer
in relation to an employee." See Agnew, 712 F.2d at 1513 (quoting
29 U.S.C. 203(d)). If, as the Secretary argues, the significant
factor in the personal liability determination is simply the
exercise of control by a corporate officer or corporate employee
over the "work situation," almost any supervisory or managerial
employee of a corporation could be held personally liable for the
unpaid wages of other employees and the civil penalty related
thereto. We adhere to the view expressed in Agnew that such an
expansive application of the definition of an "employer" to a
personal liability determination pursuant to the FLSA is untenable. 
 When an agency makes an error of law in its
administrative proceedings, a reviewing court may remand the case
to the agency so that the agency may take further action consistent
with the correct legal standards. See South Prairie Constr. Co. v.
Local No. 627, Int'l Union of Operating Eng'rs, 425 U.S. 800, 806
(1976) (per curiam); Cissell Mfg. Co. v. United States Dep't of
Labor, 101 F.3d 1132, 1136-37 (6th Cir. 1996)(citing cases). In
this case, the Board's personal liability determination relating to
the corporate employees reflects a misperception of the critical
components of the personal liability analysis identified in Donovanv. Agnew, 712 F.2d 1509, and elaborated herein. Because there is
no basis for concluding that the Board would have reached the same
result had it applied the correct legal standard, cf. NLRB v.
Wyman-Gordon Co., 394 U.S. 759, 766 n.6 (1969), we remand to the
district court with instructions that it, in turn, remand to the
Secretary for reconsideration consistent herewith of the personal
liability of Harold and Marlene Woods for any civil penalty
imposed. 

 C. Willfulness of the Violations
 Alternatively, plaintiff-appellants argue that even if
the temporary workers were their employees, the Board erred in 
finding that plaintiffs "willfully" violated the FLSA's overtime
compensation provisions, within the meaning of 16(e) of the Act. 
Citing the well-established test of a "willful violation"
articulated in McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133
(1988) (holding that an employer acts willfully for the purposes of
the FLSA's statute of limitations if it "knew or showed reckless
disregard for the matter of whether their conduct was prohibited by
the FLSA"), the Board concluded that plaintiffs either knew that
their conduct was prohibited by the FLSA, or showed a reckless
disregard for that possibility. In reaching this conclusion, the
Board relied on examples set forth in 29 C.F.R. 578.3(c), a
regulation based on the Richland Shoe standard which defines the
term "willful violation" for the purposes of 16(e)'s civil
penalty provision. See 57 Fed. Reg. 49,128 (1992)(supplementary
information) (stating that the regulation's definition of a
"willful" violation is based on the Richland Shoe decision).
 First, citing 29 C.F.R. 578.3(c)(2), the Board 
observed that during the 1989-1990 and 1992 investigations the Wage
and Hour Division put plaintiffs on notice that plaintiffs'
recordkeeping practices and overtime compensation practices
violated the Act, and in fact gave plaintiffs a Wage and Hour
Division publication which stated that temporary help companies are
the joint employers of the workers they place. The Board reasoned
that the Wage and Hour Division's notice to plaintiffs "was
sufficient under [29 C.F.R. 578.3(c)(2)] to find that plaintiffs
willfully violated the Act." Second, the Board rejected
plaintiffs' contention that their alleged violations were not
"willful," within the meaning of 16(e), because they relied on
the opinion of Baystate's attorney and accountant that the
temporary workers were not covered by the Act. Citing 29 C.F.R. 
578.3(c)(3), the Board found that plaintiffs' reliance on such
opinions "was not sufficient" after the Wage and Hour Division
advised them that they were required to pay overtime compensation
to the temporary workers, and that plaintiffs' failure to make
"further inquiries" over and above obtaining the advice of a
professional constituted a reckless disregard of the requirements
of the Act.
 Although neither party challenges or defends 29 C.F.R. 
578.3(c)'s examples of "willful" violations, we note their 
incongruity with the Richland Shoe standard on which the regulation
is based. Pursuant to section 578.3(c)(2), an employer "knowingly"
violates the FLSA if its actions are at variance with advice
received from a responsible official of the Wage and Hour Division. 
See 29 C.R.F. 578.3(2)(2). On its face, such a standard
precludes legitimate disagreement between a party and the Wage and
Hour Division about whether the party is an employer covered by the
Act, leaving a putative employer in an untenable position: either
accept the Wage and Hour Division's position and comply with its
advice, or risk a finding of a willful violation of the Act. 
Whether the FLSA covers a particular putative employer has
engendered considerable litigation, which has in turn given rise to
various court-fashioned tests of employer status. These tests are
by necessity fact-driven and context-specific, and in some cases
there may be room for legitimate disagreement between a party and
the Wage and Hour Division as to whether the party is an employer
within the meaning of the FLSA. Because legitimate disagreement
may exist about the Act's coverage, we have significant
reservations about 29 C.F.R. 578.3(c)(2)'s blanket assertion that
a party's decision not to comply with the Wage and Hour Division's
advice constitutes a "knowing" violation of the Act under the
Richland Shoe standard.
 Furthermore, pursuant to 29 C.F.R. 578.3(c)(3), an
employer shows "reckless disregard" for the requirements of the Act
if it "should have inquired further into whether its conduct was in
compliance with the Act, and failed to make adequate further
inquiry." 29 C.F.R. 578.3(c)(3). Although it is possible to
envision circumstances in which a failure to make further inquiry
into the legality of one's conduct might constitute a reckless
disregard of the FLSA, section 578.3(c)(3) by its terms 
specifically, that a party "should have inquired further" about the
legality of its conduct embraces a negligence standard of
liability. The Richland Shoe Court, however, expressly rejected a
negligence standard of liability, see Richland Shoe, 486 U.S. at
133-35, and noted that an employer does not act willfully even if
it acts unreasonbly in determining whether it is in compliance with
the FLSA, see id. at 135 n.13.
 At best, the regulation's examples of "willfulness" are
incomplete and unhelpful, and we are troubled by the Board's
considerable reliance on them in reaching its conclusion that
plaintiffs willfully violated the FLSA's overtime compensation
provisions. To the extent that the Board failed to take into
consideration the Richland Shoe standard of willfulness by placing
undue weight on the regulation's dubious examples of such conduct,
it did not apply the appropriate standard to the willfulness
determination. Accordingly, we conclude that a remand is necessary
to permit the Board to take further action consistent with the
correct legal standard of a "willful violation" embodied in the
Richland Shoe decision. 

III. CONCLUSION
 Finding no error in the Board's conclusion that the
corporate plaintiffs were "employers" of the temporary workers, we
affirm the district court's grant of a summary judgment in favor of
the Secretary on that issue. With respect to the personal
liability and willfulness issues, however, we remand to the
district court with instructions that it, in turn, remand this case
to the Secretary for further proceedings consistent herewith.
 Affirmed in part, vacated in part, and remanded. All
parties to bear their own costs.