**Alexis M. HERMAN, Secretary of Labor, Plaintiff,**

v.

**HOGAR PRADERAS DE AMOR, INC.,**
Carmen Díaz Alverio, Defendants.

No. CIV. 98–1342(HL).

United States District Court,
D. Puerto Rico.

Jan. 25, 2001.

Isabel Munoz-Acosta, U.S. Attorney's Office District of P.R., Civil Div., Hato Rey, PR, Evan R. Barouh, U.S. Dept. of Labor, New York, NY, for plaintiff.

Luis E. Pabon-Roca, Faccio & Pabon Roca, San Juan, PR, for defendants.

## OPINION AND ORDER

LAFFITTE, Chief Judge.

Plaintiff, the Secretary of Labor ("the Secretary") brings this cause of action pursuant to the Fair Labor Standards Act ("FLSA").[1] Defendants are Hogar Praderas de Amor ("Hogar") and Carmén Díaz

---

1. 29 U.S.C.A. §§ 201—219 (West 1998 & Supp.2000).

Alverio ("Díaz"). Hogar is a non-profit Puerto Rico corporation, and Díaz is the president of the company and the president of the board of directors. The Secretary alleges that Defendant willfully violated the FLSA's provisions on minimum wages, overtime pay, and record keeping.[2] She seeks injunctive relief, liquidated damages, and an order that Defendants pay Hogar's employees the amount they should have received had they been paid in accordance with the FLSA's minimum wage and overtime provisions. The Court held a five-day bench trial on this matter, and it is now ready to rule.

## FINDINGS OF FACT

The parties stipulated to the following facts:

1. Hogar is a Puerto Rico corporation which operates a nursing home for elderly patients who reside on Hogar's premises. Díaz is its president and the president of its board of directors.[3]

2. From July 1994 up to the time of the trial, Díaz hired and fired Hogar employees; set their work hours; directed their work activities; and had the authority to set their wages or delegated this authority to other employees.[4]

The Court makes the following additional findings of fact:

3. Hogar's operations have three shifts per day. The 7:00 a.m. to 3:00 p.m. shift has two nursing aides who attend to the patients; two dietary or kitchen employees; two maintenance workers who clean the premises and do laundry; and one secretary. The 3:00 p.m. to 11:00 p.m. shift has two nursing aides; a dietary person who leaves at 5:00 p.m.; and the two mainte-nance workers who started at 7:00 a.m. and work until 4:00 p.m. On the last shift, from 11:00 p.m. to 7:00 a.m., only two nursing aides are working.[5]

4. In 1994, when Hogar began its operations, its workers were paid at a rate of $3.35 per hour.[6] Throughout 1995, Hogar continued to pay this rate, although some workers were paid at $3.85 per hour.[7] In 1996, Hogar paid its workers at rates ranging from $3.35 to $5.00 per hour. For the two-week pay period beginning November 24, 1996, Hogar began to pay all its workers at $4.25 per hour.[8]

5. Hogar obtained part of its funding to pay its employees through subsidies from the local government, including the Puerto Rico Department of Labor. The proposals and forms that Hogar submitted to request this funding stated that its workers would be paid at $3.35 or $3.85 per hour. In one of these government programs, the Puerto Rico Department of Labor agreed to pay half of the wages of Hogar's workers. That is, the local Department of Labor agreed to pay half of $3.35 per hour. At no time did anyone from the Puerto Rico Department of Labor inform Hogar that these rates were less than the minimum wage rates set by federal law. The information that Defendants received from the Puerto Rico Department of Labor was that the federal minimum wage did not apply to Hogar.[9] They also received advice on what wages to pay from Elba García, who prepared Hogar's funding proposals and who had experience in doing this work for nursing homes.[10]

6. When a new employee began working as a nurse's aide, maintenance/laundry worker, or kitchen worker, Hogar required the worker to participate in a two-day

2. 29 U.S.C.A. §§ 206(a)(1), 207(a)(1), 211(c), 215(a)(2) & (5).

3. Docket no. 20, at 1–2.

4. Docket no. 20, at 2–3.

5. Transcript at 133–34, 321–22, 442.

6. Transcript at 324–29.

7. Joint exhibit I.

8. Joint exhibit II.

9. Transcript at 323–31.

10. Transcript at 377–79.

unpaid "training." This training consisted of little, if any, instruction, and the employee was put to do the regular work of the position.[11]

7. In a regular eight hour shift, a worker would work seven hours and have a one hour unpaid meal time break. Thus, in a normal five-day work week, an employee would work 35 hours. Hogar's time sheets through 1996 did not reflect how many hours an employee worked each day or week, only how many total hours he or she worked in a two-week pay period. By 1997, the timesheets indicated how many hours an employee worked each day and week.[12]

8. Nurse's aides and maintenance/laundry workers who worked the 7:00 a.m.—3:00 p.m. shift would sign out for one hour at lunch time. Although they signed out, they continued to work for all or part of this lunch period. From July 15, 1994, to February 20, 1999, these workers worked for approximately thirty minutes during the one-hour lunch period for which they had signed out.[13] After February 20, 1999, they took a full one-hour lunch break.[14]

9. Nurse's aides and maintenance/laundry workers normally worked five shifts a week. When a worker in these categories worked an extra shift, he or she was paid in cash at their regular hourly rate.[15] The workers would sign a separate time sheet for these hours.[16] From July 15, 1994, to July 20, 1999, these workers worked approximately one extra shift per month.[17]

10. In October 1996, Hedda Acevedo, an official from the United States Department of Labor visited Hogar and informed Díaz that Hogar's workers were entitled to the federal minimum wage.[18]

11. By the last week of November 1996, Hogar was paying all its employees at least $4.25 per hour. By the last week of December 1996, all employees were making $4.75.[19]

12. As part of the pretrial investigation and preparation for this case, Department of Labor officials met with Díaz to discuss, among other things, a possible ·settlement. At one point, the parties entered into an agreement.[20] Pursuant to this agreement, Díaz signed a document which provided for a payment plan whereby Hogar would make eleven installments for a total of $52,569. The document, entitled "Waiver of Statute of Limitations," also contained language waiving any statute of limitations defense for claims of FLSA violations by Hogar which occurred between July 15, 1994, and July 13, 1996. The waiver read in pertinent part as follows:

> Hogar Praderas de Amor by its appropriate officer, in consideration of the withholding by the Secretary of Labor, United States Department of Labor, of the institution of legal proceedings in the United States District Court to re-

---

11. Transcript at 31, 88, 116, 146–48, 161, 179–80, 190, 214, 252, 273. Some of the employees stated that they did this unpaid training for three days. However, more of the employees stated that it was a two-day period. The Court finds that the training lasted two days.

12. Joint exhibits I, II, and III.

13. Transcript at 37–38, 93–94, 131–33, 164–65, 191–93, 213, 252–53, 271–72. The Secretary argues that workers on the other shifts also had to work through their mealtimes. The evidence does not support this claim. Hogar's patients were asleep during all or part of the 3:00 p.m.—11:00 p.m. and the 11:00 p.m. and 7:00 a.m. shifts, and the workers were able to take a full one-hour meal

break. Transcript at 93, 119, 123, 164–65, 270–71, 436–38.

14. Transcript at 273.

15. Transcript at 48, 101, 131, 161, 183–84, 194, 274, 288–89, 391–92.

16. Transcript at 48, 99–101, 243–44, 255–56, 275.

17. Transcript at 46, 103, 164, 195, 255, 276.

18. Transcript at 331–32.

19. Joint exhibit II.

20. Transcript at 335–39.

solve the question of alleged violations of the Fair Labor Standards Act, does hereby waive all rights which may be available ·to it after July 13, 1996 by virtue of the statute of limitations contained in Section 6 of the Portal–to–Portal Act of 1947 (61 Stat. 84; Public Law 49, 80th Congress), and Hogar Praderas de Amor further agrees that this waiver (or a copy thereof) may be introduced as evidence of the waiver of the said statute of limitations in any action which may be brought by the Secretary of Labor under Section 17 of the Fair Labor Standards Act of 1938, as amended, to recover any back wages that may be due to any employee or former employee, earned subsequent to July 15, 1994 through July 13, 1996, and due by virtue of the failure to meet the requirements of the Fair Labor Standards Act with respect to compensation by Hogar Praderas de Amor or enjoin the unlawful withholding of any such back wages. ´

Díaz signed this document as the owner of Hogar.[21]

13. Díaz does not speak English. When she met with Department of Labor officials to sign the document, did not threaten her or try to force her to sign.[22] They did explain to her that the waiver was intended to protect the workers' rights and that by signing it, Hogar would be renouncing certain rights.[23]

## APPLICABLE LAW

The Secretary alleges violations by Defendants of the FLSA's provisions on minimum wages, overtime pay, and record keeping. An employer must pay its employees, at a minimum, wage rates established by statute. Up to September 30, 1996, the minimum wage was $4.25 an hour. From October 1, 1996, to August 31, 1997, it was $4.75 an hour. Thereafter, it was $5.15 an hour. 29 U.S.C.A. § 206(a)(1).

Additionally, an employee who works more than forty hours in a week is entitled to an overtime rate of at least one and one-half time her normal rate. *Id.* § 207(a)(1).

### A. Time period covered by this cause of action

As an initial matter, the Court must resolve a dispute as to the temporal scope of this cause of action. The FLSA has a two-year statute of limitations. 29 U.S.C.A. § 255(a). The complaint was filed on April 2, 1998. Therefore, the Secretary's claims would normally be limited to violations occurring after April 2, 1996. The Secretary, however, seeks to bring claims for alleged violations which occurred more than two years before the filing of the complaint. She argues that Defendants have waived the FLSA's statute of limitations.

■ As discussed above, Díaz signed a waiver of the statute of limitations defense for any violations back to July 15, 1994. Defendants challenge the validity of this waiver on the grounds that Díaz does not understand English; that in the meeting when the agreement was signed, Department of Labor officials did not explain to her that she was waiving this defense; and that she did not understand the full significance of the document she was signing. The problem with Defendants' arguments is that, as a general rule, a party is bound by an agreement that it has signed. *See Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith,* 170 F.3d 1, 21 n. 17 (1st Cir.1999); *Mercury Coal & Coke v. Mannesmann Pipe and Steel,* 696 F.2d 315, 318 (4th Cir.1982); *Stereo Gema, Inc. v. Magnadyne Corp.,* 941 F.Supp. 271, 276 (D.P.R.1996); *Elite Parfums, Ltd. v. Rivera,* 872 F.Supp. 1269, 1273 (S.D.N.Y. 1995); *Swiggett v. Swiggett, Inc.,* 1939 WL 8462, 55 P.R.R. 72, 79 (1939); *Pellicier v. Fernández,* 1913 WL 5113, 19 P.R.R. 111,

---

**21.** Joint Exhibit IX.

**22.** Transcript at 358.

**23.** Transcript at 451, 465.

115 (1913); *Murray v. Cunard S.S. Co.*, 235 N.Y. 162, 165–66, 139 N.E. 226, 228 (N.Y. 1923) (Cardozo, J.).

■ In the present case, Defendants have provided no reason for the Court to disregard this rule. Díaz testified that she was not threatened or forced to sign the document. Both sides received consideration under the agreement: Defendants waived the statute of limitations defense and the Secretary agreed not to file suit for the alleged violations.[24] Defendants claim that Díaz did not consult with an attorney prior to signing. The Court finds this claim to be unavailing. While Díaz may have signed without the benefit of an attorney, there is no evidence whatsoever that Defendants prevented her from consulting with one. Defendants also claim that Díaz did not understand the significance of the waiver. This argument also fails to carry the day. First, the Court finds to be credible the two Department of Labor officials who testified that Díaz did in fact receive an explanation of the waiver.[25] Second, Díaz is a sophisticated and educated person. Even if she had not been afforded an explanation, she should have been cognizant of the risks inherent in signing an agreement without a full understanding of its contents. That Díaz may have signed the document without legal advice or without a complete comprehension of its significance does not relieve Defendants of their obligation to comply with it. Accordingly, the Court holds that the Secretary's cause of action covers any

violations from July 15, 1994, to July 20, 1999, the date of the bench trial.[26]

### B. Carmen Díaz as employer

■ The Secretary argues that Díaz is an employer as defined by the FLSA and that therefore she should be personally liable for any judgment entered against Defendants. Under the FLSA the term "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." 29 U.S.C.A. § 203(d). A corporation's status as an employer of the workers at issue will not necessarily preclude a determination that another entity or individual also constitutes an employer of the workers. *Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668, 676 (1st Cir.1998). Congress intended the FLSA's reach to extend beyond the traditional common law limits of the employer-employee relationship. *Id.* at 677; *Donovan v. Agnew*, 712 F.2d 1509, 1513 (1st Cir.1983).

■ The First Circuit, however, has cautioned that the statute's expansive definition of employer "should not be afforded too much weight." *Baystate*, 163 F.3d at 677. Not every corporate officer with control over payroll matters will be personally liable for the corporation's failure to comply with the FLSA's requirements on minimum and overtime wages. *Id.*; *Donovan*, 712 F.2d at 1513. A court determining an officer's personal liability should consider such factors as whether she has a significant ownership interest in the corporation; whether she had personal responsibility

24. The Secretary ultimately did file suit when Defendants failed to comply with the agreement's payment plan.

25. Transcript at 451, 465.

26. The Secretary argued in her post-trial brief that Díaz is a self-confident, intelligent, and articulate businesswoman and that such a person would not sign a document unless she fully understood it. Defendants' counsel misconstrues this point as being an argument that if Díaz is educated, she must know English. Worse, Defendant's counsel goes on to state that such an argument is racist and ethnocentric.

The Court finds this language by Defendant's counsel to be wholly inappropriate. He has misread and misinterpreted the Secretary's arguments. Before making such a spurious allegation, he should have carefully read and considered the Secretary's brief. Apparently, he failed to do this.

The Secretary's counsel has at no time during this case demonstrated even the slightest hint of prejudice. The Court reprimands Defendant's counsel for such slipshod and unprofessional tactics.

for the decision that lead to the conduct which violated the FLSA; and whether she had control of significant aspects of the corporation's day-to-day operations, including the compensation of employees. *Baystate*, 163 F.3d at 677–78.

█ In the present case, the parties have stipulated that during the relevant time period, Díaz hired and fired employees; set the hours for Hogar's workers; directed their work activities; and had the authority to set their wages.[27] Díaz' general supervisory control of work activities is not, by itself, sufficient to make her personally liable. *See Baystate*, 163 F.3d at 678. However, she did sign the waiver as the owner of Hogar. Moreover, she had control over the setting of the wage rates of Hogar's workers. Thus, she was personally responsible for the conduct that ultimately lead to this cause of action. Additionally, Defendants have not challenged, in either the pretrial order or in their posttrial brief, the Secretary's argument that Díaz is an employer as defined by the FLSA. Because she did have control over the setting of wages and because Defendants have not contested the Secretary's arguments on this issue, the Court finds that Díaz is an employer under the FLSA and therefore individually liable in this case.

## C. Specific violations

### 1. Minimum wage issue

One of the Secretary's claims is that Defendants paid their workers at rates below the minimum wage. The Secretary presented ample testimony and documentary evidence in support of this claim, and Defendants do not contest it. At trial, Díaz herself admitted that Hogar employees were being paid at less than the minimum wage. Hogar's payroll records indicate that its employees were being paid at rates below the minimum wage. Accordingly, the Court holds that Defendants violated the minimum wage provisions of section

206(a)(1) of the FLSA. Defendants shall indemnify each Hogar worker who was paid between July 15, 1994, to July 20, 1999, at a rate below the federal minimum wage. Defendants shall pay each of these workers an amount that would bring him or her up to the minimum wage level. For example, an employee who was paid $3.35 an hour in October 1994, when the minimum wage was $4.25, shall be paid 90 cents for each hour worked. As suggested by the Secretary at the close of the trial, the Court hereby orders the Secretary to prepare computations of the amounts owed by Defendants for each worker who was paid below the applicable minimum wage rate. The computations shall be submitted to the Court by **February 28, 2001.**

### 2. Training issue

The Secretary also claims that Defendants' practices for paying Hogar employees for overtime, mealtime, and training also violated the FLSA. Before the Court proceeds to determinations on these matters, it is necessary to first resolve a controversy regarding the adequacy of the Secretary's evidence. To support her claims, the Secretary presented the testimony of twelve present or former Hogar employees: ten nurse's aides and two maintenance workers. Additionally, Defendants presented the testimony of one nurse's aide and one maintenance worker. During the period covered by this cause of action, Hogar has had many more employees. Defendants argue that the witnesses which the Secretary presented were insufficient to allow the Court to make a finding as to all of Hogar's workers.

█ When an employer does not keep adequate payroll records on the challenged compensation practice, the Secretary can meet her burden by proving that a representative sample of the employer's workers have performed work for which they were improperly compensated and by producing "sufficient evidence to show the

---

27. Docket no. 20, at 2–3.

amount and extent of that work as a matter of just and reasonable inference." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687–88, 66 S.Ct. 1187, 1192, 90 L.Ed. 1515 (1946); *Secretary of Labor v. DeSisto*, 929 F.2d 789, 792 (1st Cir.1991). If the Secretary is able to make this showing, the employer then has the burden of presenting evidence of the exact amount of work or evidence to refute the Secretary's proof. *Mt. Clemens*, 328 U.S. at 687–88, 66 S.Ct. at 1192. The Secretary does not have to present the testimony of each underpaid employee; rather, she may put on a representative sample of employees. *Reich v. Southern New England Telecomm.*, 121 F.3d 58, 67 (2nd Cir.1997); *DeSisto*, 929 F.2d at 792; *Herman v. Hector I. Nieves Transp., Inc.*, 91 F.Supp.2d 435, 446 (D.P.R.2000). When there are different job categories, however, at least one representative employee or one person with first-hand knowledge of the category should testify. *DeSisto*, 929 F.2d at 793. Generally, a worker can represent other workers only if they all do substantially similar work. *Id.* There is no minimum ratio that the Secretary must meet; the adequacy of the representation is based on the nature of the work, working conditions, on-the-job relationships, and the witnesses' credibility. *Id.*

█ In the present case, the Secretary presented testimony from the nurse's aide and maintenance/laundry categories of Hogar workers. The witnesses' testimony on the alleged violations coincided, and for the most part the Court finds them to have been credible witnesses. Moreover, the work of all of Hogar's nurse's aides is substantially similar: they all take care of the home's patients. And all maintenance workers also do the same thing: they clean and do laundry. Thus, the Court holds that the evidence in the record is sufficient to permit the Court to draw a reasonable inference as to the alleged violations suffered by all of Hogar's nurse's aides and maintenance/laundry workers.

The other two categories of jobs at Hogar were not so adequately represented. No representative of Hogar's secretaries testified. Thus, the Court is unable to draw any inference as to their compensation from the evidence presented. The only evidence as to kitchen workers was the testimony of Angela Marrero, a maintenance worker, who stated that she was trained in the kitchen. She was a credible witness, and the Court holds her testimony to be sufficient to permit the Court to draw a reasonable inference as to the training of kitchen workers. With regard to any overtime or mealtime violations, however, there was no evidence regarding kitchen workers. Thus, the Court will, based on the evidence presented, draw inferences for the following categories: all the alleged violations as to Hogar's nurse's aides, all the alleged violations as to the maintenance/laundry workers, and the training violations as to the kitchen workers.

With regard to training, the Secretary claims that Defendants violated the FLSA by not paying new employees for work done during what Defendants called a "training" period in the employee's first two days on the job. Although Defendants may have classified this initial period as a training, little or no instruction was offered to the employee, and he or she would perform the regular duties of the position without any special supervision or direction.

█ Job-related trainings generally are compensable under the FLSA. *Moreau v. Klevenhagen*, 956 F.2d 516, 521 (5th Cir.1992), *aff'd*, 508 U.S. 22, 113 S.Ct. 1905, 123 L.Ed.2d 584 (1993). The FLSA regulation on whether an employee should be compensated for training period reads as follows:

> Attendance at lectures, meetings, training programs and similar activities need not be counted as working time if the following four criteria are met:
> (a) Attendance is outside of the employee's regular working hours;
> (b) Attendance is in fact voluntary;

(c) The course, lecture, or meeting is not directly related to the employee's job; and

(d) The employee does not perform any productive work during such attendance.

29 C.F.R. § 785.27 (2000); *Dade County v. Alvarez*, 124 F.3d 1380, 1384 (11th Cir. 1997); *Price v. Tampa Elec. Co.*, 806 F.2d 1551, 1552 (11th Cir.1987).

 In the case before the Court there is undisputed evidence that during these "trainings," Hogar employees performed productive work during their regular working hours. Any actual training or education was minimal, and there was no indication that these training periods were voluntary. Accordingly, the Court holds that Defendants shall be liable for reimbursing nurse's aides, maintenance/laundry workers, and kitchen workers for this uncompensated work at the workers' regular starting wage.[28] Each worker shall be entitled to 14 additional hours of wages. The Secretary shall prepare computations of the amounts owed by Defendants for each worker in these three categories who started working at Hogar between July 15, 1994, and July 20, 1999. The computations shall be submitted to the Court by **February 28, 2001.**[29]

### 3. Overtime issue

The Secretary also claims that Hogar employees were not properly paid for overtime work. Díaz admitted in her testimony that workers were paid straight time in cash for overtime work, and Defendants in their post-trial brief acknowledged this practice.[30] As noted above in the Findings of Fact, each nurse's aide and maintenance/laundry worker worked approximately one extra shift per month. An average work week consisted of five seven-hour shifts, for a total of 35 hours. Thus, an extra shift would have brought that worker's weekly total to 42 hours. The last two hours should have been paid at time-and-a-half. 29 U.S.C.A. § 207(a)(1). They were not. Therefore, the Court holds that Defendants violated the overtime provisions of section 207(a)(1) as to the nurse's aides and maintenance/laundry workers at Hogar.

The Secretary shall prepare computations of the amounts owed by Defendants for each worker in these two categories. Each worker in these two categories shall be entitled to compensation for two hours of overtime pay for each month worked between July 15, 1994, and July 20, 1999. Because the workers have already received straight time pay for this overtime work, they shall only be entitled to half their regular rate for the time worked. The

---

**28.** If Hogar's starting wage for a particular employee was below the legal minimum, the amount to which the employee shall be entitled will of course be adjusted upward to the applicable minimum wage.

**29.** In a slightly different approach to this issue, some courts have used a six-factor test developed by the U.S. Department of Labor to determine whether a trainee is an employee and therefore entitled to coverage under the FLSA. *See Reich v. Parker Fire Protection Dist.*, 992 F.2d 1023, 1025–27 (10th Cir. 1993); *McLaughlin v. Ensley*, 877 F.2d 1207, 1208–09 (4th Cir.1989); *Atkins v. General Motors Corp.*, 701 F.2d 1124, 1127 (5th Cir. 1983); *Archie v. Grand Central Partnership, Inc.*, 997 F.Supp. 504, 531, 535 (S.D.N.Y. 1998). Under this test, a trainee is not an employee if (1) the training is similar to what would be taught in a vocational school; (2)

the training is for the trainee's benefit; (3) the trainee does not displace a regular worker and works under close supervision; (4) the employer derives no immediate benefit from the trainee's activities; (5) the trainees are not guaranteed a job at the completion of the training; and (6) the employer and the trainee understand that the trainee is not entitled to compensation for the training. *Parker Fire*, 992 F.2d at 1025–26.

In the present case, the parties did not mention this test in their briefs or at trial. The Court need not determine which test is more applicable. Under the six-part test, Defendants would fare no better. The "training" for Hogar employees constituted regular work which benefitted Hogar. Thus, the trainees were Hogar employees and were entitled to protection under the FLSA.

**30.** Docket no. 40, at 17.

computations shall be submitted to the Court by **February 28, 2001.**

### 4. Mealtime issue

■ The Secretary also claims that Defendants are liable for mealtime breaks for which Hogar workers signed out but were not compensated. The Court finds that from July 15, 1994, to February 20, 1999, nurse's aides and maintenance/laundry workers who worked the 7:00 a.m.—3:00 p.m. shift would sign out for one hour at lunch time, but would continue to work for approximately thirty minutes. A bona fide mealtime is not worktime. *Hartsell v. Dr. Pepper Bottling Co. of Texas,* 207 F.3d 269, 274 (5th Cir.2000); 29 C.F.R. § 785.19 (2000). An employee is entitled to at least a minimum wage for time worked. 29 U.S.C. § 206. In the present case, Hogar's nurse's aides and maintenance employees were not paid for the approximately thirty minutes of work they did during each lunch break. Accordingly, the Court holds Defendants to be liable for this unpaid work. Each nurse's aide or maintenance worker who worked the 7:00 a.m. to 3:00 p.m. shift from July 15, 1994, to February 20, 1999, shall be entitled to an additional half hour's worth of wages for each seven hour day worked. The Secretary shall prepare computations of the amounts owed by Defendants for each worker in these two categories who worked the 7:00 a.m.—3:00 p.m. shift at Hogar between July 15, 1994, and February 20, 1999. The computations shall be submitted to the Court by **February 28, 2001.**

### D. Liquidated damages

#### 1. Underpaid minimum wages

■ The Secretary requests that Defendants be subjected to liquidated damages. When the Secretary brings an action for an amount of unpaid minimum wages or overtime compensation, she may also recover an equal amount as liquidated damages. 29 U.S.C.A. § 216(c). The court may, in its discretion, decide not to award liquidated damages if the employer shows that its actions or omissions which gave rise to the cause of action were done in good faith and that there were reasonable grounds for believing that the acts or omissions were not a violation of the FLSA. 29 U.S.C.A. § 260 (West 1998). This burden on the employer is a difficult one to meet. Double damages will be the norm, and single damages will be the exception. *Herman v. RSR Sec. Services Ltd.,* 172 F.3d 132, 142 (2nd Cir.1999); *Southern New England,* 121 F.3d at 71; *Local 246 Utility Workers Union v. Southern Cal. Edison,* 83 F.3d 292, 297 (9th Cir.1996); *Bankston v. State of Ill.,* 60 F.3d 1249, 1254 (7th Cir.1995); *Martin v. Cooper Elec. Supply Co.,* 940 F.2d 896, 908 (3rd Cir. 1991); *Hector I. Nieves,* 91 F.Supp.2d at 449. To demonstrate good faith, the employer must adduce substantial evidence showing an honest attempt to determine the requirements of the FLSA and to comply with them. *Southern New England,* 121 F.3d at 71; *Kinney v. District of Columbia,* 994 F.2d 6, 12 (D.C.Cir.1993). An employer decision made " 'above board and justified in public' " may establish good faith and reasonableness. *Bernard v. IBP, Inc. of Nebraska,* 154 F.3d 259, 267 n. 35 (5th Cir.1998) (quoting *Walton v. United Consumers Club, Inc.,* 786 F.2d 303, 312 (7th Cir.1986)).

■ In the present case Defendants received orientation from the Puerto Rico Department of Labor regarding the proper wages they should pay their employees. Furthermore, in their proposals to Puerto Rico government agencies—including the Puerto Rico Department of Labor—for subsidies of their employee payrolls, Defendants stated what rates they would be paying their workers. Under one of these grants, the Puerto Rico Department of Labor agreed to pay half of each employee's wages, some of which were below the federally mandated minimum. There is no evidence that Defendants concealed this information from the local government agencies. By funding half of the wages of some of Hogar's workers, the Puerto Rico

268

Department of Labor in effect was giving its tacit approval to these pay scales. Based on this funding and based on the orientation provided by the Puerto Rico Department of Labor to Defendants, the Court holds that they were justified in assuming that they were paying a legal wage to Hogar's workers. Once a United States Department of Labor official informed them otherwise, they promptly changed the rates they paid their employees. Accordingly, the Court holds that Defendants have shown the requisite good faith and reasonableness in paying their workers below the minimum wage. The request for liquidated damages on this issue is denied.

 The Secretary argues that if her request for liquidated damages is denied, Defendants should be assessed pre-judgment interest. Generally, interest should be allowed in a back pay award under the FLSA. *Secretary of Labor v. Daylight Dairy Products, Inc.*, 779 F.2d 784, 789–90 (1st Cir.1985), *overruled on other grounds by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988); *Donovan v. Sovereign Security, Ltd.*, 726 F.2d 55, 58 (2nd Cir.1984). Therefore, the Court imposes interest on the amount to be assessed against Defendants for their underpayment of the minimum wage, discussed in part C.1. of this opinion. The interest shall accrue from January 1, 1997, the date by which Defendants were in full compliance with the minimum wage, to the date of this judgment. The rate of interest is set at the discretion of the court. *E.E.O.C. v. County of Erie*, 751 F.2d 79, 82 (2nd Cir.1984). The Court holds that the rate of the 52–week treasury bill auctions, which are applied to post-judgment interest, shall be used. This rate as of January 1, 1997, was 5.45 percent. *See* 28 U.S.C.A. § 1961, Historical and Statutory Notes (West Supp.2000). When the Secretary prepares the computations of the amounts owed by Defendants for each worker who was paid below the applicable

minimum wage rate, she shall also submit a computation of the pre-judgment interest owed on this amount.

*2. Overtime, training, and mealtimes*

 The Secretary also requests liquidated damages for the amounts Defendants owe for the unpaid trainings, the unpaid mealtime work, and the underpaid overtime. With regard to these items, Defendants have proffered no evidence to establish their good faith. Defendants aver that their payment of straight time in cash for overtime work is standard practice in the nursing home industry. A showing of conformity with an industry-wide practice does not establish good faith. *Southern New England*, 121 F.3d at 71. Because Defendants have not established that their payment practices for overtime, mealtimes, and training were done in good faith or that there were reasonable grounds for believing that these practices complied with the FLSA, the Court holds that they are subject to liquidated damages equal to the amounts to be computed pursuant to parts C.2., C.3., and C.4. of this opinion.

*E. Remaining issues*

There are two remaining issues raised by the Secretary. One is a claim that Defendants violated the FLSA's requirement that an employer keep proper payroll records. *See* 29 U.S.C.A. § 211(c). The regulations require that an employer maintain, for three years, payroll records which include the following information: the number of hours worked each day; the total number of hours worked each week; the total daily and weekly straight time earnings; pay for overtime; and the total wages paid each pay period. 29 C.F.R. §§ 516 .2 and 516.5 (2000). Hogar's payroll records did not contain all of this information.[31] Moreover, overtime pay was recorded on a separate sheet. Accordingly, the Court holds that Defendants violated section 211(c).

31. Joint exhibits I & II.

The second remaining issue is a request by the Secretary for a prospective injunction restraining Defendants from future violations of the FLSA. The FLSA allows a court, in its discretion, to issue such injunctions. 29 U.S.C.A. § 217; *Hector I. Nieves,* 91 F.Supp.2d at 449. A court determining whether to issue an injunction should consider (1) the employer's prior and present conduct; (2) any pattern of repetitive violations; (3) an employer's intent to violate the FLSA; (4) the employer's good faith attempt to comply with the FLSA; (5) whether the employer complied once it became aware of the FLSA's requirements; (6) efforts to prevent recurrence; (7) the threat of violations in the future; and (8) absence of bad faith. *See Reich v. Petroleum Sales, Inc.,* 30 F.3d 654, 657 (6th Cir.1994); *Martin v. Coventry Fire Dist.,* 981 F.2d 1358, 1362 (1st Cir. 1992); *Martin v. Funtime, Inc.,* 963 F.2d 110, 114 (6th Cir.1992); *Brock v. Big Bear Market No. 3,* 825 F.2d 1381, 1383 (9th Cir.1987).

In the present case, it is true that Defendants committed a number of violations of the FLSA's provisions. However, there has been no showing that these violations were done in bad faith. Rather, it appears that Defendants were careless and received some bad advice. There is evidence that once the United States Department of Labor informed Defendants that they had to pay their workers the federally mandated minimum wage, they did so. Furthermore, the evidence indicates that Defendants now insist that Hogar's employees not work during their mealtime break. The evidence shows that Defendants have taken efforts to comply with the FLSA. Furthermore, there does not appear to be a risk that Defendants will make the same mistakes in the future. Accordingly, the Court denies the request for an injunction.

*F. Summation of award*

Based on all of the above, the Court rules in favor of the Secretary. Judgment shall be entered finding that Defendants (both Hogar Praderas de Amor, Inc. and Carmen Díaz Alverio, individually) are liable for the following:

1. An amount compensating each Hogar employee an amount that would bring that employee's wages up to the applicable minimum wage. Interest on the amount for each employee shall be assessed at the rate of 5.45 percent, to accrue from January 1, 1997, to the date of this judgment.

2. An amount compensating any Hogar nurse's aide, maintenance/laundry worker, and kitchen worker who started working between July 15, 1994, and July 20, 1999, for 14 hours of uncompensated work which Defendants had designated as "training." Liquidated damages shall also be assessed in an amount equal to the amount of this unpaid time.

3. An amount compensating each Hogar nurse's aide and maintenance/laundry worker for underpaid overtime. For each month worked between July 15, 1994, and July 20, 1999, each worker shall receive two hours of pay at half that worker's regular rate of pay. Liquidated damages shall also be assessed in an amount equal to the amount of this underpaid time.

4. An amount compensating each nurse's aide or maintenance worker who worked the 7:00 a.m. to 3:00 p.m. shift from July 15, 1994, to February 20, 1999. For each day worked, the worker shall be entitled to an additional half hour's worth of wages. Liquidated damages shall also be assessed in an amount equal to the amount of this unpaid time.

The Secretary shall prepare computations of all of these amounts and submit by **February 28, 2001,** in a clear and readily-understandable format these calculations. Once these calculations are submitted, an

270

amended judgment will be entered incorporating their final tallies.

**IT IS SO ORDERED.**